# In the United States Court of Federal Claims

Nos. 24-451, 24-456, 24-463, 24-483, 24-495, 24-519, 24-542, 24-547, 24-571, 24-579, 24-584, 24-588, 24-590, 24-604, 24-623, 24-630, 24-673, 24-797

TECHNATOMY CORP., et al.,

        Plaintiffs,

        v.

THE UNITED STATES,

        Defendant,

        and

GOVCIO, LLC, et al.,

        Defendant-Intervenors.

Consol. No. 24-451
Originally filed March 30, 2026
Publicly filed April 7, 2026

**OPINION AND ORDER**
**Granting the government's and intervenors' motions for judgment on the administrative record, denying plaintiffs' motions for judgment on the administrative record, and denying King Street's motion to exclude evidence**

In this bid protest case, the Department of Veterans Affairs (VA) solicited proposals to overhaul its information technology system over the next five to ten years.[1] The solicitation explained that, with some possible variations, the VA would award contracts to the thirty offerors with the highest-rated proposals. The VA would then issue task and delivery orders to that pool of awardees. The VA received 173 eligible proposals from which it selected its top thirty. Thirty unsuccessful offerors filed suits challenging the VA's award decision, and fifteen successful offerors intervened to defend their awards. In September 2024, this court granted in part and denied in part the government's and intervenors' motions to dismiss. Soon after that, the court granted the

---

[1] This opinion was originally filed under seal. The parties had no proposed redactions. The court reissues the opinion publicly.

1

government's motion to remand the case to the VA for reconsideration of the challenged decision. After reconsidering the solicitation and the protesters' arguments, the VA issued a new award decision. The VA added three new offerors to the awardee pool, canceled one award, and exercised the solicitation's on-ramp provision to preserve awards made to two offerors, resulting in a list of 32 awardees.

Seventeen protesters now move for judgment on the administrative record based on the VA's most recent award decision.[2] The government cross-moves for judgment on the administrative record, as do fifteen intervenors.[3] Because the VA's determinations were not arbitrary or capricious, and the protesters have not shown that they have been prejudiced by any errors the VA may have made, the court will grant the government's and intervenors' motions for judgment on the administrative record and will deny the protesters' motions for judgment on the administrative record. One protester, King Street, separately moves to exclude a declaration the government provided with its cross-motion, but because that declaration appropriately addresses the government's prejudice arguments, the court will deny King Street's motion.

## I.    Background

I have previously described the solicitation at issue in this case. *See Technatomy Corp. v. United States*, 173 Fed. Cl. 491 (2024). For brevity, I will not repeat that discussion, and I will discuss the substance of the VA's actions on remand as relevant in the discussion sections below.

---

[2] One protester, Insignia, filed a motion for judgment on the administrative record, but then, before its reply brief was due, moved to voluntarily dismiss its complaint; the court granted the motion. ECF Nos. 712, 713. Because Insignia has been dismissed from the case, the court will not address the arguments made in its motion for judgment on the administrative record (ECF No. 583) and does not count it among the moving protesters.

[3] One intervenor, Taurian Consulting, cross-moved for judgment on the administrative record (ECF No. 648) and remains part of the case, but it did not file a reply brief.

After the government's and intervenors' motions to dismiss were granted in part and denied in part, on remand, the VA identified inconsistencies and other errors in its evaluations of thirteen proposals. AR404089.[4] The VA corrected its scoring to address the errors. As a result, three offerors (Technatomy, Taurian, and Peregrine) moved into the top thirty. AR404089-93. One offeror (JTech) lost enough points to fall out of the top thirty, to ninety-eighth place. AR404106. Two offerors (Deloitte and CGI) dropped out of the top thirty, to thirty-first and thirty-second place, because of the others' rise in rank. AR404106. The VA awarded contracts to the new top thirty offerors and exercised the solicitation's on-ramp provision to also award contracts to Deloitte and CGI, resulting in 32 awards. AR404108.

In May 2025, the VA issued its new award decision (ECF No. 521), and this court reopened the case, with one protester plaintiff—Tribility—having dismissed its appeal and not rejoined the case (ECF Nos. 529, 548). The court dismissed Peregrine, Technatomy, and Taurian as plaintiffs (ECF No. 529) and granted their motions to intervene as defendant-intervenors instead (ECF Nos. 533, 536, 537).[5] Several plaintiffs voluntarily dismissed their protests. ECF Nos. 544, 550, 551, 555, 558, 574, 575, 576. The remaining plaintiffs filed amended complaints and new motions for judgment on the administrative record. The government and intervenors filed responses and cross-motions for judgment on the administrative record. Those motions and cross-motions are now fully briefed. Plaintiff King Street moved (ECF No. 675) to exclude the declaration of Jeffrey Neill, which was attached to the government's cross-motion. That is also fully briefed.

---

[4] The parties submitted an administrative record to the court and also filed a joint appendix through ECF. I will cite the administrative record with the designation AR. All cited pages can be found in the joint appendix, ECF No. 733.

[5] Although Technatomy is now an intervenor, for procedural simplicity, the court elected not to re-caption the case. ECF No. 529 at 3.

These tables list the relevant ECF numbers for the parties' briefs on their motions for judgment on the administrative record:

| Plaintiff | Motion | Response and Reply |
| --- | --- | --- |
| Vision Tech Group, LLC | 557 | 664 |
| T4NG2 JV LLC | 560 | 661 |
| Arrow ARC LLC | 562 | 660 |
| Omni Cares, LLC | 564 | 662 |
| Intellect JV LLC | 566 | 663 |
| ThunderYard Liberty JV II, LLC | 569 | 670 |
| ClearView Technologies, LLC | 570-1 | 667 |
| General Dynamics Information Technology, Inc. (GDIT) | 573 | 665 |
| Innovenue, LLC, Systematic Innovations, LLC, and Veteran First Technologies, LLC | 584-1 | 668 |
| TISTA Science and Technology Corporation | 581 | 666 |
| Freedom Technology Partners, LLC | 587 | 671 |
| Pinnacle Computer Technology LLC | 589-1 | 669 |
| King Street Technology Partners, LLC | 594-1 | 674 |
| Mission Training LLC | 592 | 673 |
| Vector Innovative Solutions, LLC | 595 | 672 |

| Defendant / Intervenor | Cross-Motion and Response | Reply |
| --- | --- | --- |
| Government | 644 | 717 |
| Digipathy LLC | 659 | 730 |
| Cognosante MVH, LLC | 657 | 731 |
| Booz Allen Hamilton, Inc. | 652-1 | 720 |
| Technatomy Corporation | 654 | 729 |
| Science Applications International Corp. (SAIC) | 653 | 721 |
| Peregrine Digital Services, LLC | 656-1 | 727 |
| Veterans EZ Info Inc. (VetsEZ) | 658 | 728 |
| GovCIO, LLC | 655 | 726 |
| T4 Designs, LLC | 650 | 724 |
| Canopy Health, LLC | 647 | 725 |
| VCH Partners LLC | 645 | 718 |
| CGI Federal Inc. | 649 | 719 |
| ManTech Advanced Systems International, Inc. | 646 | 722 |
| ECS Federal, LLC | 651-1 | 723 |
| Taurian Consulting, LLC | 648 | N/A |

The court heard oral arguments on the parties' motions on February 11 and 12, 2026.

4

## II.    Discussion

The protesters raise many challenges to the VA's award decisions. The government organizes the challenges into rough topics, which the court generally adopts, addressing sub-issues within those topics and making a few changes to the order of the topics.

A.    Use of the on-ramp provision
B.    Clarifications
C.    Advanced software technologies
D.    The first four relevant experience projects and subcontractor letters of commitment
E.    Small business participation commitments
F.    Potential collusion
G.    Veteran employee percentages
H.    Joint venture agreements
I.    Alleged misrepresentations
J.    Awardee-specific evaluation issues
K.    Protester-specific evaluation issues
L.    SAM.gov registration
M.    Prejudice
N.    Injunctive relief
O.    King Street's Motion to Exclude

The parties submitted approximately 1,955 pages of briefing discussing the dozens of issues in this case. The court has read and considered every issue, even if not every issue is explicitly discussed in the opinion. To the extent any specific issue is not explicitly discussed in the opinion, it is because that issue is not material to the outcome of this case.

On a motion for judgment on the administrative record under rule 52.1 of the Rules of the Court of Federal Claims, this court must determine whether, given all disputed and undisputed facts, the evidence in the record establishes that the moving party has met its burden of proof. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018). The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, requires this court to review an agency procurement decision under the standards provided by the Administrative Procedure Act (APA). 28 U.S.C. § 1491(b)(1)-(4). This court's review of an agency's decision is "highly deferential." *DynCorp International, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021).

Under the APA, "an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. In the bid protest context, according to the Federal Circuit, a "bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quotation marks omitted).

Under this court's "rational basis" review, the court determines "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Mitchco International, Inc. v. United States*, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (quotation marks omitted). "Contracting officers are given broad discretion in their evaluation of bids," and a court may not substitute its judgment for the agency's reasonable decision. *DynCorp*, 10 F.4th at 1311. A protester "bears a heavy burden" to demonstrate that the agency's decision lacked a rational basis. *AugustaWestland North America, Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018). A protester must demonstrate "a clear and prejudicial violation of applicable statutes or regulations." *Banknote*, 365 F.3d at 1351 (quotation marks omitted). In other words, even if the court finds that the agency acted arbitrarily or capriciously, a protester is entitled to relief only if it "was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

### A.    The VA reasonably used the solicitation's on-ramp provision

Six protesters challenge the VA's exercise of the solicitation's on-ramp provision. *See* ECF No. 584-1 at 16-19 (Innovenue, Systematic, Veteran First); ECF No. 589-1 at 34-35 (Pinnacle); ECF No. 569 at 35-37 (ThunderYard); ECF No. 581 at 28-29 (TISTA). The solicitation begins with an "inten[t] to award up to thirty contracts." AR1939. The solicitation also explains that "[t]he Government may utilize an On-Ramp to add additional prime Contractors through any means deemed appropriate, including in the event an Off-Ramp is exercised." AR1862. The solicitation

6

further notes that using the on-ramp is within the VA's "sole discretion." *Id*. The VA exercised the on-ramp provision to maintain awards to Deloitte and CGI because both offerors were knocked out of the top thirty not due to a reduction in their own points, but because of errors the VA made in evaluating other proposals that increased those other offerors' points. *See* AR404107. In general, the protesters' on-ramp challenges can be sorted into three categories: (1) fairness (ECF No. 569 at 35; ECF No. 581 at 28); (2) whether the exercise of the on-ramp provision required the VA to add more service-disabled veteran owned small businesses (SDVOSBs) (ECF No. 584-1 at 18); and (3) whether exercising the on-ramp provision violated the terms of the solicitation (ECF No. 589-1 at 34-35).

The VA rationally decided to exercise the on-ramp provision. The VA rationally determined that the interests of fairness were best served by maintaining Deloitte's and CGI's awards when they fell out of the top thirty due to the VA's errors rather than any errors of their own. The solicitation left that decision to the VA's "sole discretion." AR1862.

As an initial matter, the government argues that the VA's on-ramp determination was a matter of contract administration and not the proper subject of a suit. ECF No. 644 at 161. The court does not agree with that argument, as contract performance has not even begun, and awards are still being determined. But the court need not agree with that argument, as the VA's determination was neither arbitrary nor capricious.

Although some protesters argue that the VA was not allowed to consider fairness in its decisions, the solicitation implicitly requires that the VA act fairly. Under 48 C.F.R. § 1.602-2, contracting officers are responsible for ensuring "impartial, fair, and equitable treatment" of federal contractors. It was not irrational for the VA to consider fairness when deciding whether to exercise the on-ramp provision. Protesters argue that even if the VA may consider fairness, fairness

did not require maintaining the expectations of successful offerors who would otherwise lose their awards. *E.g.*, ECF No. 581 at 28-29. TISTA notes that the VA removed another offeror—JTech—from the award pool during the remand, so fairness did not require maintaining all awards that offerors anticipated. *Id.* at 28. But JTech was in a very different posture. JTech lost points on reevaluation, resulting in its drop in the rankings. By contrast, CGI and Deloitte did not lose any points on reevaluation; they dropped in rank only because previously unsuccessful offerors surpassed them after reevaluation. AR404107-08. While reasonable minds might disagree as to what fairness required in this case, the VA acted within the scope of its discretion to determine that it was fair to keep Deloitte and CGI in the award pool.

In fact, as discussed briefly at oral argument, the VA's approach to the on-ramp provision is, in some ways, akin to setting a point cutoff. After the first award decision, the lowest-ranked awardee—CGI, in thirtieth place—had 15,725.15 verified points. AR193553; AR198152. On remand, when the number of offerors with at least 15,725.15 verified points did not change dramatically, the VA effectively determined that it was fair to maintain awards to all offerors with at least 15,725.15 verified points. That did not reduce the status of any offeror and only served as a benefit, to two offerors.

Some protesters also argue that once the VA decided to use the on-ramp provision, it was required to use the provision to add SDVOSBs rather than non-SDVOSB offerors. *See* ECF No. 584-1 at 18; ECF No. 668 at 12. In support, the protesters invoke the so-called "rule of two." ECF No. 668 at 11. Under the rule of two, if a federal contracting officer "has a reasonable expectation that two or more [SDVOSBs] will submit offers and that the award can be made at a fair and reasonable price," the officer "shall award contracts on the basis of competition restricted to [SDVOSBs]." 38 U.S.C. § 8127(d)(1). The protesters argue that the use of the on-ramp provision

established a contract; there were two or more unsuccessful SDVOSB offerors interested; so any on-ramped offerors should have been only SDVOSBs. ECF No. 668 at 11-12.

Contracting officers are not always required to apply the rule of two. For example, one provision of the Federal Acquisition Regulation (FAR), 48 C.F.R. § 19.503(a), permits contracting officers conducting multiple-award procurements to instead reserve one or more contract awards for small business concerns. For this solicitation, the VA chose to reserve 15 awards for SDVOSBs, explaining that a full set-aside was not feasible. AR1939. The VA explained that decision in the solicitation. *Id.* To the extent that protesters believe the rule of two should have applied to this solicitation, they are making a challenge to the terms of the solicitation that is unavailable post-award. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

Protesters concede that the rule of two does not apply to the overall solicitation, called Transformation Twenty-One Total Technology Next Generation Two (T4NG2). *See* ECF No. 584-1 at 17-18; ECF No. 668 at 11-15. Instead, protesters characterize the VA's use of the on-ramp provision as a new contract award. ECF No. 668 at 11. But that characterization contradicts the language of the solicitation, which explains that the on-ramp may be used only to add contractors for work within the scope and ceiling of the T4NG2 contract. AR1862 (stating that agreements with on-ramped contractors "shall include the same terms and condition of this Contract," may be granted by "revisiting the original pool of T4NG2 Offerors," and will "in no way increase[] the ceiling established for the T4NG2 program"). Adding contractors to conduct work within the scope of the existing solicitation is not a new contract action. *See* FAR, 48 C.F.R. § 5.001 (New "contract action[s]" do not include "actions that are within the scope and under the terms of the existing

9

contract."). Awards made via the on-ramp provision are awards under the existing T4NG2 contract and therefore are not governed by the rule of two.

Finally, some protesters argue that the solicitation requires that the VA make no more than thirty awards. ECF No. 589-1 at 34 (Pinnacle); ECF No. 668 at 9 (reply of Innovenue, Systematic, and Veteran First). But the solicitation states that the on-ramp provision may be used to "add additional prime Contractors," implying that it could be used for additional contractors beyond the envisioned thirty. AR1862. This court has already noted that use of the on-ramp under this solicitation is not limited to replacing removed contractors. *Technatomy*, 173 Fed. Cl. at 498. The VA's use of the on-ramp to maintain two awards beyond the envisioned thirty on remand falls squarely within the discretion the solicitation provides.

Even if the VA had not acted rationally in exercising the on-ramp provision, as will be evident in several ways throughout this case—though not in every place the government raises it—the protesters cannot show prejudice. Without a showing of prejudice, no bid protest can succeed. *Bannum*, 404 F.3d at 1351. With the on-ramp, no protester has demonstrated that it was harmed by the VA's decision to add two more awardees to the pool. None of the protesters lost points due to the VA's decision to on-ramp Deloitte and CGI, nor did any of the protesters drop in rank due to that decision. No protester has shown that the VA's use of the on-ramp provision for Deloitte and CGI in any way reduced its own chance of receiving an award.

**B.    The VA rationally permitted clarifications in some circumstances and rationally chose not to engage in discussions**

Ten protesters challenge the VA's use of clarifications in the procurement process. *See* ECF No. 570-1 at 7-17, 25-32 (Clearview); ECF No. 587 at 32 (Freedom Tech); ECF No. 584-1 at 14-16 (Innovenue, Systematic, Veteran First); ECF No. 594-1 at 37-38 (King Street); ECF No. 589-1 at 21-30 (Pinnacle); ECF No. 569 at 19-24 (ThunderYard); ECF No. 581 at 23-25 (TISTA);

ECF No. 595 at 43-45 (Vector). The FAR defines "clarifications" as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306. The government may choose to request clarifications from some awardees without requesting clarifications from all. And, absent a requirement in the solicitation, the government is not required to request clarifications. *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1348 (Fed. Cir. 2021); *GovWave, LLC v. United States*, 175 Fed. Cl. 564, 642 (2025).

### 1. The VA was not obligated to request clarifications from any offeror here

Pinnacle argues that the VA "abused its discretion in failing to ask Pinnacle for clarification" concerning its relevant experience project (REP) 4 before reducing Pinnacle's points. ECF No. 589-1 at 22. To receive points for a REP, each offeror choosing a certain substantiation method was required to submit "excerpts of Contract, Task Order, and/or Award documentation that substantiate the information" provided. *E.g.*, AR91520. The VA required those documents so it could verify that, for each REP, the offeror had justified the claimed points.

Pinnacle did not provide the required documents but argues that it could have provided them, or could have pointed to other parts of its proposal, in a clarification. The VA appropriately decided that the substantiating-document requirement was material, serving a substantive purpose. The VA needed those substantiating documents to be able to efficiently evaluate proposals. The VA reviewed at least 780 REPs for the T4NG2 procurement. AR400002. The VA did not have to request additional information from every offeror who failed to submit the required documents for any REP. *GovWave*, 175 Fed. Cl. at 623 (finding requirements material when they were in place "to ensure that offerors submitted complete proposals, including attention to detail[,] … to demon-

strate the [offerors'] ability to carefully meet government requirements"). The VA therefore reasonably considered the requirement for substantiating documents to be a material requirement of the solicitation. *See ManTech*, 141 Fed. Cl. 493, 508 (2019) (A solicitation "provision is considered to have a substantive purpose when it is important to the government's evaluation.").

Regardless, required documents are generally material elements of a solicitation. *See generally Superior Optical Labs, Inc. v. United States*, 173 Fed. Cl. 243, 255-56 (2024) (finding a failure to include "exact material required by the statute, its implementing regulation, or the solicitation," including a failure to include a required form, to be material).

Further, as the government notes (ECF No. 644 at 17-18), allowing a party to provide documents, like previously undisclosed contracts, could be considered a discussion rather than a clarification, opening the VA up to potentially having to accept revised proposals from all offerors.

The VA therefore rationally decided that Pinnacle's failure to provide substantiating documents was a material deficiency. "The onus is not on the government to find ways to clarify or correct material errors in submitted proposals." *Gemini Technology Services LLC v. United States*, 177 Fed. Cl. 227, 235 (2025).

By contrast, the VA did seek other clarifications from certain other offerors: It requested binary yes-or-no answers that did not require the VA to review additional documents or substantive responses. For example, section L.12.10 of the solicitation permits an offeror to claim points for its accounting system if the offeror "self-certif[ies] that there ha[ve] been no material changes to the accounting system since the last audit of its accounting system." AR1932. The VA later recognized that the solicitation was ambiguous as to whether it required an explicit self-certification; some offerors understood that a representation that the information was accurate would suffice under the solicitation's terms. So the VA requested clarifications, asking each offeror that had

claimed points under section L.12.10 to explicitly certify that there had been no material changes to its cost accounting system since that system was last audited. AR400005-06. Offerors did not submit narratives or documentation in connection with those self-certifications. Similarly, the VA requested a clarification from one offeror, Clear Vantage, asking it to "respond simply that it certifies or cannot certify that its [industry] certifications are current." AR400006 (referring to Clear Vantage as CVPSII). The VA did not invite Clear Vantage to submit new documents or narratives concerning its industry certifications.

In the one circumstance where an offeror—SAIC—provided a further narrative in response to the VA's request for clarification, the VA explicitly disregarded the narrative and considered only the binary yes-or-no answer. AR400003-04. That narrative response is discussed below. *See* part II.B.2.

Pinnacle did not face disparate treatment when the VA prohibited it from providing new documents as a clarification, just as the VA was not obligated to request a clarification; the VA did not permit offerors to provide post-submission substantiating documents and only allowed offerors to provide binary yes-or-no clarifications. That line drawing was reasonable.

Pinnacle alternatively argues that it should have received points for its REP 4 because, although the VA noted that it was missing corroborating information in the form of substantiating documents, that corroborating information could be found in other parts of Pinnacle's proposal. ECF No. 589-1 at 23. But, just as the VA had no obligation to request additional unsubmitted documents, the VA had no obligation to scour the rest of Pinnacle's proposal for information corroborating Pinnacle's REP 4. *See Gemini*, 177 Fed. Cl. at 235 (The "onus is not on the government to find ways to clarify or correct material errors in submitted proposals."). The solicitation stated

that an offeror "must highlight, or otherwise identify, the specific written passages" in its substantiating documents that supported the claimed points. AR1920. As with other requirements in the solicitation, the highlighting requirement was meant to aid the VA in reviewing what turned out to be 78 proposals containing a total of 780 REPs. AR400002. While failure to highlight a relevant excerpt was not necessarily a material error, the VA was not responsible for digging through an offeror's proposal to find corroborating information that the offeror failed to highlight. *Gemini*, 177 Fed. Cl. at 235. Instead, it was the offeror's responsibility to submit a well-written, well-organized proposal to facilitate meaningful review. *Id.*; *see GovWave*, 175 Fed. Cl. at 623. The VA's evaluation of Pinnacle's REP 4 was not arbitrary or capricious.

In a similar vein, Vector argues that the VA should have engaged in clarifications or discussions to resolve errors in Vector's proposal. ECF No. 595 at 34. Vector submitted an incorrect version of its self-scoring worksheet. Vector explains that it accidentally submitted an older version of the worksheet, which lacked a required section, rather than the latest version the VA provided. ECF No. 595 at 32.

The solicitation states that any offeror found to have manipulated the self-scoring worksheet will "be immediately excluded from consideration and no longer eligible for award." AR1910. The VA determined that, because of the blanket prohibition on manipulating the worksheet, Vector committed a material error by submitting the wrong version of the worksheet. AR192105. Because the error was material, according to the VA, it could not be corrected through clarifications. *See* 48 C.F.R. § 15.306.

The VA's determination was not arbitrary or capricious. Vector asserts, and no one disputes, that it did not intentionally use the wrong form for its self-scoring worksheet. But the re-

quirement of not having manipulated the worksheet does not depend on whether an offeror modified it intentionally. There is no dispute that Vector submitted an incorrect self-scoring worksheet. *See, e.g.*, ECF No. 595 at 14-15, 32; ECF No. 644 at 236. The form Vector submitted lacked the standard scoring section expressly required by the solicitation. AR1923; ECF No. 595 at 33. The contracting officer reviewed Vector's form and determined that Vector had manipulated the self-scoring worksheet. AR192105. It was not irrational for the contracting officer, evaluating a worksheet that omitted required sections, to conclude that Vector had manipulated it. The court will not disturb the contracting officer's rational inference. *See Campbell v. Merit Systems Protection Board*, 27 F.3d 1560, 1564 (Fed. Cir. 1994) (A court reviewing a challenge to an agency's conclusions of fact will generally "defer as long as the record contains evidence from which one reasonably could draw the challenged inference.").

Vector suggests that the VA should have opened discussions to allow Vector to fix its error. ECF No. 595 at 36-38. While the VA reserved the right to conduct discussions, it did not obligate itself to conduct discussions. AR1939 ("The Government intends to award contracts without discussions."). The VA acted rationally in rejecting Vector's incorrect self-scoring worksheet and in declining to hold discussions with Vector to allow it to fix its proposal. *See Gemini*, 177 Fed. Cl. at 235; *DynCorp International LLC v. United States*, 76 Fed. Cl. 528, 539 (2007) ("[W]hen offerors are on notice that an award may be made without discussions, the government is not required, as a general rule, to hold discussions before award.").[6]

---

[6] Vector submitted an opening brief that was 46 pages long (ECF No. 595), six pages over the limit (Rules of the Court of Federal Claims, Rule 5.4(b)(1)). Although I read the entire brief and will not strike any part of it at this point, that was just one brief, out nearly two thousand pages of briefs addressed in this opinion. Parties are generally advised to remain within the page limits, which exist for a good reason and are obligatory under the court's rules.

Freedom Tech also argues that the VA engaged in disparate treatment by seeking clarifications from some offerors concerning their past marginal performance ratings but not seeking clarifications from Freedom Tech. ECF No. 587 at 32. Disparate treatment can arise when two like proposals are treated differently, such as when two proposals are "substantively indistinguishable" or when an agency "inconsistently applie[s] objective solicitation requirements." *Office Design Group v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

The VA was unable to access approximately 16 percent of the 780 evaluated relevant experience projects in the Contractor Performance Assessment Reporting System (CPARS). AR400002. For any CPARS record the VA could not access, the VA asked the offeror to either "certify" or "not certify" whether the past performance record would show entirely satisfactory or better performance. *Id.*

Unlike those offerors, for Freedom Tech's REPs, the VA was able to access CPARS. The CPARS record showed less-than-satisfactory ratings for Freedom Tech's REPs 6 and 10. ECF No. 587 at 29-30 (acknowledging marginal ratings). A narrative explanation of Freedom Tech's less-than-satisfactory ratings would qualify as a discussion rather than a clarification. *Centerra Group, LLC v. United States*, 153 Fed. Cl. 407, 418 (2018) (holding that an agency communication was a discussion where the revision "afforded [the awardee] an opportunity to explain how its proposal would meet proposal requirements"). And Freedom Tech had the opportunity to provide that narrative to the VA in the first instance (AR1944) and did not provide it (AR400168). Both because Freedom Tech's proposed REPs contained marginal ratings and because the VA sought clarifications only where it was unable to access CPARS, Freedom Tech has not shown that its proposal was "substantively indistinguishable" from those of the other offerors or that the agency "inconsistently applied objective solicitation requirements." *Office Design*, 951 F.3d at 1372.

16

### 2.    The VA did not hold discussions

Eight protesters argue that the VA engaged in unequal discussions, holding discussions with some parties and not others. *See* ECF No. 570-1 at 7-8, 25-29 (Clearview); ECF No. 589-1 at 28-30 (Pinnacle); ECF No. 584-1 at 14 (Innovenue, Systematic, Veteran First); ECF No. 594 at 38 (King Street); ECF No. 581 at 23-25 (TISTA); ECF No. 569 at 20-21 (ThunderYard). Those protesters argue that communications between the VA and certain other offerors constituted discussions.

Discussions "between the Government and offerors … are undertaken with the intent of allowing the offeror to revise its proposal." 48 C.F.R. § 15.306(d). While the FAR gives a contracting officer broad discretion to resolve minor errors through clarifications (*see* 48 C.F.R. § 15.306(a)(2)), if the contracting officer engages in discussions with one offeror, he must also hold discussions with the other offerors (48 C.F.R. § 15.306(e)). The court will generally defer to an agency's categorization of a communication as a clarification rather than a discussion. *See Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 (Fed. Cir. 2003).

Clearview and Pinnacle argue that the VA allowed offerors to update industry certifications through discussions. ECF No. 570 at 25-29 (Clearview); ECF No. 589-1 at 28-30 (Pinnacle). The government responds that the VA did not conduct discussions but rather "allowed offerors to clarify minor discrepancies in proposals by certifying that information already in substantiating documentation was still current." ECF No. 644 at 22.

The VA characterized its request for more information as a clarification "in [an] instance[] where it was unclear if an Offeror's industry certification was current." AR400005-06. That determination was not arbitrary or capricious and comports with the agency's view of what is appropriately deemed a clarification, addressed above (part II.B.1). In requesting those clarifications, the VA did not allow the offerors to revise their proposals. *See* 48 C.F.R. § 15.306(d). Instead, the VA

asked a binary yes-or-no question and got a yes-or-no answer. The Federal Circuit has previously held that more extensive communications could constitute clarifications, rather than discussions. In *Information Technology*, 316 F.3d at 1321, the Air Force asked an offeror to provide "additional relevant past performance information, to further describe the lead role" for the offeror's subcontractors. Here, the VA's request for a less extensive yes-or-no answer on whether an offeror's certification was current was reasonably characterized not as a discussion but as a clarification.

Protesters also argue that the VA engaged in unequal discussions when it allowed CGI and A2E each to self-certify "that there have been no material changes to [its] accounting system since the last audit of [its] accounting system." ECF No. 570-1 at 27 (citing AR5132; AR10806). As already discussed briefly (part II.B.1), the VA explained that that the solicitation contained an ambiguity with respect to accounting systems: The solicitation did not clarify whether an offeror implicitly self-certified by the fact of claiming the relevant points. AR400005. The VA determined that confusion caused by that ambiguity led to potential discrepancies in its treatment of CGI and A2E's proposals; the VA addressed those discrepancies through clarifications. *Id.* The VA's determination was rational. Neither CGI nor A2E modified its proposal by certifying that there had been no material changes to its accounting system since its last audit.

No protester has argued that the VA allowed only some offerors to certify the currentness of their accounting systems through clarifications. And the VA recognized on remand that it had treated like offerors differently in the first instance. The change on remand was to treat like offerors alike. Thus, there is no disparate treatment, either.

Clearview argues that the VA held discussions with SAIC when the VA asked for confirmation that SAIC's past performance was all satisfactory, and in response SAIC submitted a writ-

18

ten narrative concerning its past performance. ECF No. 570 at 7-8. During the original procurement process, the VA was unable to access past performance records for several offerors, including SAIC, due to technical issues with CPARS. AR400002. To fill in the gaps, the VA issued requests, characterized as clarifications, requiring each offeror to either certify or not certify that its past performance records would show only satisfactory or better performance. *Id.* SAIC responded that it could not certify only satisfactory or better ratings for its REP 3 but provided a narrative response explaining the negative past performance. AR34572-73. Clearview challenged that narrative in its October 2024 motion for judgment on the administrative record. ECF No. 436-1 at 29. On remand, then, the VA disregarded SAIC's narrative response. ECF No. 644 at 26-28. Instead, the VA eventually gained access to SAIC's CPARS record and independently verified the information in SAIC's proposal. AR400003; *see also* AR152511-13. The VA explained that it "was able to identify from the CPARS records that all ratings were Satisfactory or better from the time when SAIC assumed contract performance," as the less-than-satisfactory ratings arose while a subcontractor was in charge of the poorly rated aspects of the project. AR400003.

Clearview argues that the VA "falsely" stated that it disregarded SAIC's additional supporting narrative. ECF No. 570-1 at 11. Clearview points to correspondence in which the contracting officer compares SAIC's narrative to the relevant CPARS record. *Id.* at 12-16 (citing AR152657-59; AR34573). That correspondence was from September 2023. *Id.* As the government points out (ECF No. 644 at 26-28), the correspondence was associated with the VA's initial contract award, not the award on remand. On remand, the VA stated that, "[i]n reconsidering this matter, the Agency purposefully disregarded and did not consider the additional supporting narrative provided in SAIC's clarification response." AR400004.

Clearview argues that "it is unreasonable to believe that the [contracting officer] and the two members of the Past Performance Evaluation Team … simply wiped the previously held information from their memory." ECF No. 667 at 7. Clearview adds that, on remand, the VA relied on four statements from SAIC's CPARS record that were also highlighted in SAIC's later narrative. ECF No. 667 at 6 (citing AR400003; AR152510-15). Clearview argues that, without the narrative from SAIC, those four statements alone do not provide "a basis for finding positive past performance." ECF No. 667 at 7. But Clearview does not dispute that the statements come from SAIC's CPARS records or argue that it was improper for the VA to independently review those records.

The VA's exercise in ignoring the later narrative is common in an adjudicative process. Courts are frequently asked to exclude documents or other evidence. *See, e.g.*, ECF No. 675 (King Street's motion to exclude Neill declaration). If the court excludes a document, it then must address the case as if it did not have access to that document. The court will not second-guess that the VA relied only on the evidence it purported to rely on without clear contrary evidence. *See Oak Grove Techs. v. United States*, 116 F.4th 1364, 1380 (Fed. Cir. 2024). Here, all the evidence the VA purported to rely on was available to it absent SAIC's narrative; there is no clear contrary evidence.

Because the VA did not rely on SAIC's narrative responses during its remand evaluations, it did not permit SAIC to revise its proposal. 48 C.F.R. § 15.306(d). The VA only allowed SAIC to confirm, with a yes-or-no answer, whether it could certify that it had only positive past performance ratings. Although the answer was no, because the government then had access to SAIC's

CPARS reports, it could view the explanations within those reports to see SAIC's justification for all less-than-satisfactory ratings. Thus, the VA did not engage in discussions with SAIC.[7]

Clearview also argues that the VA engaged in disparate treatment in its evaluation of SAIC's past performance compared with Clearview's past performance. ECF No. 570-1 at 25. As a preliminary matter, this court gives particular deference to agency evaluations of past performance. *See, e.g.*, *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013) (declining to "second-guess" an agency's evaluation of past performance); *Taahut v. United States*, 849 F. App'x 260, 266 (Fed. Cir. 2021) ("We have recognized that evaluation of past performance is a matter within the discretion of the contracting agency and that the 'agency's reasonable interpretation of the facts is entitled to considerable deference.'" (quoting *Glenn Defense*, 720 F.3d at 910)). To prevail on a challenge to the agency's subjective evaluation, "a protester must show that the agency unreasonably downgraded its proposals for deficiencies that were 'substantively indistinguishable' [from] or nearly identical [to] those contained in other proposals." *Office Design*, 951 F.3d at 1372. That standard is more deferential than the "inconsistently applied" standard the court applies when an agency disparately evaluates objective criteria such as page limits. *Id.*

Clearview has not demonstrated that its CPARS narrative is "substantively indistinguishable" from SAIC's CPARS narrative. *See Office Design*, 951 F.3d at 1372-73. The VA deducted

---

[7] At the oral argument, Clearview argued that the VA could not have independently verified the information in SAIC's proposal without reference to SAIC's narrative because SAIC did not have CPARS reports for the 2014-to-2015 and 2019-to-2021 timeframes. But the VA did not need to rely on reports from 2014 to 2015 because those reports predate SAIC's demonstrated improvement. And counsel for the government confirmed at the oral argument that CPARS contained reports for SAIC's work through 2021. *See generally* AR34572 (SAIC certifying that CPARS contained satisfactory or greater ratings for all rated elements from September 2017 through June 2021).

points because Clearview had a less-than-satisfactory rating on its REP 4. AR400171. Clearview argues that its CPARS narrative described remedial measures and positive past performance, like SAIC's CPARS narrative explaining SAIC's remedial measures and improved performance. ECF No. 570-1 at 24-25. But the two narratives are not substantively indistinguishable. SAIC's CPARS report noted that, after SAIC took over the contract, there was a "great change" and that SAIC's communication was "a model on how contracts should be operating." AR400003; AR152512-13. By contrast, Clearview's CPARS report noted only that Clearview's joint venture member had taken steps to mitigate its marginal rating, but the report did not explain whether the mitigating measures were successful. AR181167.

Although Clearview had the opportunity to provide a one-page narrative as part of its proposal explaining any less-than-satisfactory performance record (AR1944), it elected not to (AR181032). And, unlike SAIC's CPARS record, Clearview's CPARS record did not provide any additional context to mitigate the marginal review. AR181032. Thus, Clearview's marginal rating, and its accompanying record, was not "substantively indistinguishable" or "nearly identical" to SAIC's marginal rating and accompanying record. *Office Design*, 951 F.3d at 1373. This court will not disturb the VA's discretionary determination that Clearview's past performance, unlike SAIC's, could not be validated. *Taahut*, 849 F. App'x at 266; *Glenn Defense*, 720 F.3d at 911.

Seven protesters argue that the VA conducted discussions with VetsEZ by accepting a small business subcontracting plan from VetsEZ after it had already submitted its proposal. ECF No. 589-1 at 28 (Pinnacle); ECF No. 594-1 at 37-38 (King Street); ECF No. 569 at 20-21 (ThunderYard); ECF No. 584-1 at 15 (Innovenue, Systematic, Veteran First); ECF No. 581 at 23-25 (TISTA). VetsEZ originally represented in its proposal that it was an SDVOSB. AR40020. Other offerors challenged VetsEZ's size status in front of the Small Business Administration. AR41402.

Based on the Small Business Administration's determination that VetsEZ was not a small business for the purpose of this solicitation, the VA requested that VetsEZ submit a small business subcontracting plan. *Id*. VetsEZ had not submitted a small business subcontracting plan with its initial proposal because the solicitation did not require an SDVOSB (itself a small business) to submit such a plan. VetsEZ responded to the VA's request by submitting a small business subcontracting plan. The protesters argue that the plan constitutes a discussion with VetsEZ.

But the submission and acceptance of a small business subcontracting plan does not constitute a discussion. *Consolidated Engineering Services, Inc. v. United States*, 64 Fed. Cl. 617, 627 (2005); *DynCorp*, 76 Fed. Cl. at 546. VetsEZ was reclassified as a large business and, like other large businesses bidding on this solicitation, was required to submit a subcontracting plan only after it was an apparently successful offeror. AR1938 (A "large business shall submit a small business subcontracting plan in accordance with FAR 52.219-9."); *see also* 48 C.F.R. § 52.219-9(c)(1) (requiring submission of a subcontracting plan only upon the request of a contracting officer); ECF No. 668 at 9 (Innovenue, Systematic, and Veteran First acknowledging that "[a]llowing an apparent awardee to submit a subcontracting plan after the apparent award, and the negotiation of an already-submitted plan, are both allowed under the FAR"). Thus, the VA rationally accepted a small business subcontracting plan from VetsEZ without its constituting a discussion and therefore without opening discussions to all offerors.

Protesters argue that, unlike subcontracting plans discussed in other cases, VetsEZ received points based on its plan. *See, e.g.*, ECF No. 569 at 21; ECF No. 581 at 24; ECF No. 594-1 at 38. As the VA noted on remand, and as discussed below (part II.E), offerors received points based on their subcontractor participation commitments; each offeror's commitment could encompass subcontractors not mentioned in the offeror's small business subcontracting plan. AR400278. VetsEZ

did receive points for its subcontractor participation commitment. *See, e.g.*, AR161972. But it did not receive points for its subcontracting plan, which the VA requested only after the fact. AR1766 (self-scoring worksheet indicating no points allowed for a subcontracting plan); AR41402 (VA letter to VetsEZ requesting subcontracting plan). Thus, VetsEZ did not receive points based on its later-filed small business subcontracting plan, and that plan was not a revision to its proposal.

Four protesters complain that the VA did not address their arguments concerning VetsEZ in its remand decision. ECF No. 581 at 23 (TISTA); ECF No. 584-1 at 15 (Innovenue, Systematic, Veteran First). Similarly, Pinnacle takes issue with the VA's not documenting every reevaluation in its remand decision. ECF No. 669 at 21-23. But the VA explained that it did not prepare a second evaluation concerning claims or arguments that "did not materially alter any of the Agency's original evaluation findings." AR403561. Repeating its findings was not required. *See DynCorp*, 10 F.4th at 1314 (explaining that an agency is not required to provide an explicit explanation where "the agency's decisional path is reasonably discernible").

In general, this court will defer to an agency's reasonable view that a communication was a clarification. *DynCorp*, 76 Fed. Cl. at 539-40. Here, the VA permissibly and reasonably viewed its exchanges with offerors as clarifications.

Finally, although many protesters complain about whether VetsEZ was entitled to switch from a small business to a large business, and some complain about other aspects of the VA's decision with respect to VetsEZ (addressed below), any error in the VA's evaluation of VetsEZ is harmless to any of the protesters. As already discussed, the VA permissibly added two awardees using the on-ramp. If the VA had removed VetsEZ from the awardee pool, because of its switch in size or for any other reason, under the VA's fairness reasoning, the VA would have had to use

24

the on-ramp for only one awardee, CGI. But none of the protesters would have moved into the award pool. Thus, any error would be harmless.

C. **The VA rationally interpreted and applied the criteria under main functional area 4.3, requiring offerors to show experience with "advanced software technologies"**

Nine protesters challenge the VA's interpretation of main functional area (MFA) 4.3 of the solicitation, which addresses the type of technology experience the VA was seeking from a contractor. See ECF No. 562 at 20-24 (Arrow); ECF No. 587 at 35-38 (Freedom Tech); ECF No. 592 at 18-27 (Mission Training); ECF No. 564 at 20-23 (Omni Cares); ECF No. 584-1 at 21-26 (Systematic); ECF No. 560 at 20-23 (T4NG2 JV); ECF No. 581 at 32-34 (TISTA); ECF No. 595 at 25 (Vector); ECF No. 557 at 20-23 (Vision Tech). The protesters generally argue that (1) the terms of the solicitation were latently ambiguous, and (2) the VA imposed a new unstated requirement by applying a new interpretation of MFA 4.3 on remand.

MFA 4.3 states,

> The Contractors shall provide demonstrations and transition support for *advanced software technologies*. This functional area involves *evaluating existing and emerging software technology products* against the needs of current system development and support efforts, demonstrating specific technologies in the context of supported systems, and *transitioning effective technology solutions into use*. Current technology areas of focus for VA include software architectures, databases, web-based applications, mobile applications, telehealth, enterprise solutions, wireless, and security. This mission is a critical aspect of *VA's ability to improve and advance its software engineering capability*.

AR1816 (emphasis added).

On remand, the VA interpreted "advanced software technologies" as "any software technology that [(1) is] emerging or recently developed, and (2) would be a significant improvement upon prior technology." AR403675. The government primarily supports the VA's interpretation of the term "advanced software technologies" by pointing to a variety of dictionary definitions of

the word "advanced." ECF No. 644 at 36-37. But here the better understanding comes from the use of the term in the context of the solicitation, which provides enough information to put offerors on notice of the VA's intent in using the term. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc) (explaining, in the patent context, that relying on a dictionary definition of a term often improperly "focuses the inquiry on the abstract meaning of words rather than on the meaning of … terms within the context of" the document being interpreted).

The VA's interpretation of "advanced software technologies" is consistent with the plain text of MFA 4.3, which describes "evaluating existing and emerging software technology products," "transitioning effective technology solutions into use," and "improv[ing] and advanc[ing the VA's] software engineering capability." AR1816. That surrounding language in the solicitation indicates that the VA was looking for technologies that were not longstanding but instead were new, either emerging or recently developed. Because the VA wanted to "transition[] effective technology solutions into use" and improve the VA's software engineering capability (*id.*), it was clear that the VA wanted to rely on technology that was at least new to the VA and could improve on existing capabilities. That language also indicates that the VA was looking to improve its technological capabilities significantly, rather than incrementally, as it was looking to "improve and advance its software engineering capability." *Id.* Because the plain language of the solicitation surrounding the term "advanced software technologies" is clear, it is not necessary to consult dictionaries. *Banknote*, 365 F.3d at 1353 ("We begin with the plain language of the document."). And the VA's later interpretation of the term is consistent with the plain meaning of the term in context.

The VA's interpretation of MFA 4.3, and "advanced software technologies" in particular, is not a "new unstated requirement," as some protesters argue, but rather is a reasonable restatement of the solicitation's requirements. The VA must have some latitude to reiterate the terms of

the solicitation using new formulations without being subject to accusations that it imposed a new unstated requirement. *See generally Banknote*, 365 F.3d at 1357 (explaining that a contracting officer's analysis was "discretionary analysis," not the application of unstated requirements); *Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 327-28 (2009) (accepting an agency's evaluation of relevant experience because the protester was on notice that its proposal would broadly be reviewed for its technical merit). As discussed, the terms of MFA 4.3, read together, support the VA's restatement that "advanced software technologies" must be both "emerging or recently developed" and "a significant improvement upon prior technology" (AR403675). The arguments that the terms of the solicitation were latently ambiguous or that the interpretation was an impermissible new requirement fail.

Several protesters argue that, by requiring "advanced software technologies" to be "a significant improvement upon prior technology," the VA read out "existing" technology, even though the solicitation contemplates using "existing" technology. *E.g.*, ECF No. 671 at 22 (Freedom Tech); ECF No. 668 at 17-18 (Systematic); ECF No. 673 at 9 (Mission Training). But, as the government argues (ECF No. 717 at 15-16), if evaluating any existing technology were sufficient, that would read out the requirement that the technology be "advanced." Nothing prohibited the VA from requiring proposals to show that their technology was "advanced," as MFA 4.3 explicitly requires.

Freedom Tech argues that "emerging or recently developed" in the VA's interpretation conflicts with the words "[c]urrent technology" in the solicitation. ECF No. 587 at 36-37. But in context it is clear that the word "current" is referring to the VA's area of focus ("[c]urrent technology areas of focus for VA include …"), not the types of technology the VA is seeking through its solicitation.

27

The government argues that, to the extent that the term "advanced software technologies" is unclear, any ambiguity was patent rather than latent. The government thus argues that a reasonable definition was required and not supplied pre-award, so any challenge to the VA's later refinement should have been made pre-award. Because the term was clear, it was neither patently nor latently ambiguous. Notably, although the government again relies on the numerous dictionary definitions to support the idea that any ambiguity was patent, nearly any word will have multiple possible definitions, and the existence of multiple definitions cannot necessarily correspond to a patent ambiguity. *See Phillips*, 415 F.3d at 1321-22 ("Dictionaries, by their nature, provide an expansive array of definitions. General dictionaries, in particular, strive to collect all uses of particular words, from the common to the obscure. By design, general dictionaries collect the definitions of a term as used not only in a particular art field, but in many different settings.").

Seven protesters also challenge the VA's application of the requirements of MFA 4.3; in other words, they challenge the VA's evaluation of those protesters' past experiences. *See* ECF No. 592 at 27-33 (Mission Training); ECF No. 584-1 at 21-26 (Systematic); ECF No. 595 at 21-25, 28-30 (Vector); ECF No. 562 at 21 (Arrow); ECF No. 564 at 21 (Omni Cares); ECF No. 557 at 21 (Vision Tech); ECF No. 560 at 25-26, 29 (T4NG2 JV). As a preliminary matter, the VA rationally concluded that many of the protesters' narratives were too vague or not relevant enough to earn points under MFA 4.3 (ECF No. 644 at 43-64). In arguing that certain experiences satisfied the MFA 4.3 criteria, protesters ask the court to second-guess the VA's technical evaluation. The court will rarely do that. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (A court will "not second guess" the "discretionary determinations of procurement officials" such as "technical ratings."); *Glenn Defense*, 720 F.3d at 911 (giving deference to an agency's "determination of relevance"); *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010) ("At the

outset, it is important to note that what does or does not constitute 'relevant' past performance falls within [the agency's] considered discretion."). Because the VA evaluated the protesters' past experiences and rationally determined that those experiences were not sufficiently relevant to the MFA 4.3 criteria, protesters do not meet their heavy burden.

The government describes at length the VA's reasoning for finding that the protesters' past experiences were not relevant to MFA 4.3. *See generally* ECF No. 644 at 43-64. Mission Training, for example, submitted REPs that the VA determined were more akin to operations and maintenance than advanced software, and the VA determined that Mission Training's vague narratives concerning "software engineering" did not bridge the gap. AR403679; *see also* AR403774 (similar for Systematic). The VA determined that Mission Training's description of incremental software development also did not satisfy MFA 4.3. AR403685. For T4NG2 JV, the VA determined that one conclusory sentence, which did not cite the relevant contract, was insufficient to demonstrate the claimed experience. AR403777. The VA evaluated Vision Tech's REPs 1 and 3 and determined that the narratives described common software development tasks rather than advanced software technologies. AR403859; AR403863. Omni Cares' REPs 1 through 4 described tasks like software releases and deploying and transitioning code builds, all of which the VA determined were routine and insufficient to show experience with advanced technologies. AR403760-68.

The VA did not credit Arrow's REPs under MFA 4.3 because they concerned operations-and-maintenance tasks and market research rather than advanced technology. AR403589; AR403594. Freedom Tech's REP 10 described incremental enhancements and operations and maintenance that did not satisfy the advanced technologies requirement. AR403621-26. The VA evaluated Vector's proposal and determined that it described compliance and other tasks that were not relevant or were too vague to demonstrate experience with advanced technologies. AR403851-

55. And Systematic's proposal described incremental development work and described the job of a systems engineer, senior solutions architect, and subject matter expert, without demonstrating that Systematic had done work involving advanced software technologies as contemplated by MFA 4.3. AR403771-73.

For each of the protesters' REPs, the VA exercised its technical judgment and rationally determined, based on the record before it, that the protester had failed to adequately demonstrate experience with "advanced software technology." In those circumstances, "the Court may not substitute its judgment for that of the agency." *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 740 (2007) (quotation marks omitted). The protesters have not shown that the VA was arbitrary or capricious in its decision to invalidate their points under MFA 4.3.

Likewise, whether a task falls under "advanced software technologies" within MFA 4.3 or, for example, operations and maintenance within other provisions of the solicitation, is part of the VA's technical expertise. *Glenn Defense*, 720 F.3d at 911 (giving deference to agency's "determination of relevance"); *Taahut*, 849 F. App'x at 266; *PlanetSpace*, 92 Fed. Cl. at 539. For an inquiry involving such technical judgment (*see* ECF No. 644 at 62-64 (Systematic)), this court "may not substitute its judgment for that of the agency" (*DynCorp*, 10 F.4th at 1311).

Relatedly, Freedom Tech and Mission Training argue that they suffered disparate treatment relative to other awardees with respect to MFA 4.3. ECF No. 587 at 37-39 (Freedom Tech); ECF No. 592 at 31-39 (Mission Training). They disagree with the VA's evaluation of other offerors. For example, Freedom Tech argues that the VA improperly validated points for one of CGI's REPs, which concerned product development and testing but did not identify specific technologies. ECF No. 587 at 37. Freedom Tech argues that the VA "went out of its way to validate CGI's self-score while applying a very different level of scrutiny to [Freedom Tech's] proposal." *Id.* Freedom

30

Tech makes similar arguments concerning REPs submitted by Digipathy, ECS, and Centuria, complaining that those REPs were so insufficient that the VA could only have validated the claimed points if it applied a different standard to those offerors than it applied to Freedom Tech. *Id.* at 37-39. Likewise, Mission Training alleges disparate treatment because the VA discounted its REPs as concerning routine tasks but validated points for A2E's REP 8, despite both referring to "enhancements." ECF No. 592 at 34-35. Mission Training also complains that the VA validated points claimed by other offerors for a project concerning commercial off-the-shelf and government off-the-shelf software but declined to validate points claimed by Mission Training for installing and configuring commercial off-the-shelf and government off-the-shelf software. *Id.* at 35-36.

But neither protester demonstrates that any challenged narrative was "substantively indistinguishable" from its own. *Office Design*, 951 F.3d at 1372-73. As previously noted, to demonstrate disparate application of an agency's subjective evaluation of an element like past performance, a protester must show that its proposal was "substantively indistinguishable" from or "nearly identical" to another proposal. *Id.* That is a higher bar than the "inconsistently applied" standard for objective criteria such as page limits and due dates. *Id.* at 1372. It is not enough to say that two projects use the same type of software or that two tasks both describe "enhancements" to meet the substantively indistinguishable standard. The government points to numerous differences between the protesters' narratives and the challenged narratives. ECF No. 644 at 66-67, 69-71; ECF No. 717 at 25-27. I will not restate them here. Those differences show that Freedom Tech and Mission Training have not identified differing evaluation of substantively indistinguishable proposals. They fail to establish disparate treatment or that the VA was arbitrary or capricious in its decision to validate points for the awardees.

Mission Training also argues that the VA was required to take the customer's signature at face value as confirmation that the submitted information was accurate, including that the submitted experience was relevant to MFA 4.3. ECF No. 592 at 28. Thus, according to Mission Training, the VA could not review Mission Training's underlying documents for accuracy. The court explained earlier that the VA "was required to review and evaluate each of the documents that the offerors submitted." *Technatomy*, 173 Fed. Cl. at 502. Much of the court's reasoning in deciding the motion to dismiss relied on the need for the VA to do more, not less, to verify representations made by offerors. *See, e.g.*, *id.* at 500 (noting that the solicitation required "a meaningful review" of small business participation commitments). The VA was not required to take the customer's signature at face value without verifying the accuracy of information provided. Consistent with that direction, on remand the VA explained that a signature "did not prevent [the VA] from using [its] independent judgment," and it weighed other supporting documents along with the signatures when validating points. AR403707; *see also* AR403777 (noting that a signature alone was weak evidence that T4NG2 JV's REP 1 was relevant to MFA 4.3).

As part of its argument, Mission Training takes issue with the VA's consideration of non-highlighted information in the proposal of one awardee, Credence. ECF No. 592 at 36-37. Nothing in the solicitation requires the VA to ignore non-highlighted information. Nor does the solicitation obligate the VA to search for non-highlighted information. The VA did not act irrationally, or contravene the solicitation, in reviewing non-highlighted information in Credence's proposal without scouring Mission Training's non-highlighted information. That is particularly true here, where the information that Mission Training challenges in Credence's submission came from within the same REP under review. AR403690-91. By contrast, Mission Training complains that the VA did not look to its other REPs, which were not identified as relevant to MFA 4.3, for information to

support its REP 8. ECF No. 592 at 37; AR182516. Mission Training's circumstances were not comparable to Credence's.

And, in general, the VA wrote its solicitation expecting many proposals, each containing ten REPs. It received 173 eligible proposals (AR193529 [¶2]) and reviewed at least 780 REPs (AR400002). The VA understood that it would have an easy time reviewing an organized proposal and would have a harder time reviewing a disorganized proposal. It required that offerors highlight, or otherwise identify, relevant information (AR1920) to lead the reader to the relevant information, recognizing the limited time it had to spend reading each proposal. A well-organized proposal, even without highlighting, would still lead a reader to the relevant information faster than a disorganized proposal, and the VA acted within its discretion in giving Credence higher marks for meeting all the solicitation's requirements than Mission Training, which required searching "unrelated sections of the proposal in search of needed information" that Mission Training failed to include in the identified REP. *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 786-87 (2011) (quoting *Matter of Savantage Financial Services, Inc.*, B–299798, 2007 WL 4326742, at *6 (Comp. Gen. Aug. 22, 2007)). "[C]ontracting agencies … are not obligated to go to unrelated sections of the proposal in search of needed information which the offeror has omitted or failed adequately to present." *Savantage*, 2007 WL 4326742, at *6.

**D.    The VA rationally interpreted the "first four REPs" rule and the subcontractor-letter-of-commitment requirement**

**1.    The VA rationally interpreted the first four REPs rule**

Seven protesters make arguments regarding the VA's interpretation and evaluation of the first four REPs. *See* ECF No. 562 at 4-20 (Arrow); ECF No. 566 at 4-19 (Intellect); ECF No. 594-1 at 24-33 (King Street); ECF No. 564 at 4-20 (Omni Cares); ECF No. 560 at 4-20 (T4NG2); ECF No. 581 at 4-13 (TISTA); ECF No. 557 at 4-20 (Vision Tech). The solicitation states that "the first

33

four REP project submissions (REP-1 through REP-4) must reflect projects performed by the Offeror." AR1918. "For Joint Ventures, projects performed by the Joint Venture, itself, or any of the companies making up the Joint Venture, qualify as work performed by the offeror." *Id.* If a mentor-protégé joint venture did not itself have four relevant experiences, it was permitted to submit relevant experiences from the joint venture members, as long as at least one REP was performed by the mentor and one REP was performed by the protégé. AR1919. A joint venture SDVOSB offeror was also required to submit relevant experience performed by the joint venture's managing parties for at least one of the first four REPs. *Id.* Protesters challenge the VA's interpretation of those requirements, which the government collectively refers to as the "first four REPs rule" (ECF No. 644 at 74-75). Protesters generally argue about what type of company can qualify as the offeror: whether it has to be only the offeror itself or whether it can include subsidiaries of the offeror or other companies related to the offeror. They also dispute whether the solicitation was latently ambiguous.

Before the proposal deadline, the VA told offerors that it held the broader interpretation, including subsidiaries of members of a joint venture within the category of companies that could provide the first four REPs. AR1222 (Q&A 756: "confirm[ed] that … offerors can use REPs associated with an offeror's divisions, subsidiaries, or affiliates … within the first four REPs"); AR1219 (Q&A 706: "an offeror could potentially utilize … divisions, subsidiaries, or affiliates to satisfy all 10 of the [solicitation's] REP requirements"). On remand, the VA again made clear that it was interpreting the solicitation broadly to allow a joint venture to claim relevant experience from the joint venture itself, a member of the joint venture, or a member's subsidiary. AR404096-97. The parties first dispute whether the solicitation itself was unambiguous, patently ambiguous, or latently ambiguous as to subsidiary experience. ECF No. 644 at 75-78; *See* ECF No. 562 at 4-

34

20 (Arrow); ECF No. 566 at 4-19 (Intellect); ECF No. 594-1 at 34-37 (King Street); ECF No. 564 at 4-20 (Omni Cares); ECF No. 560 at 4-20 (T4NG2 JV); ECF No. 557 at 4-20 (Vision Tech).

As the government points out (ECF No. 644 at 77-82), the solicitation contains an internal inconsistency about the meaning of the term "offeror." In section L.12.1, the solicitation allows work performed by "companies that make up the Joint Venture" to be counted as work of the "Offeror." AR1916. Thus, section L.12.1 contemplates that a member of the joint venture is considered the "offeror." On the other hand, section L.12.1.1 distinguishes the mentor and protégé of a joint venture ("companies that make up the Joint Venture") from the joint venture itself ("the Offeror"). AR1919. Further, the solicitation does not clarify whether a subsidiary of a member is considered one of the "companies that make up the Joint Venture," because the solicitation does not define "companies that make up the Joint Venture." *See* AR1902 (describing labor rates for labor "performed by the offeror" as including labor from "divisions, subsidiaries, or affiliates of the offeror"); AR1918 (noting that projects performed by "any of the companies that make up the Joint Venture will qualify as work performed by the Offeror").

King Street and Pinnacle both point out that the VA did not identify the ambiguity until after making initial awards. ECF No. 674 at 22 (King Street); ECF No. 669 at 19 (Pinnacle). They argue that the ambiguity must therefore be latent. But an ambiguity need not be discovered pre-evaluation for it to be considered a patent ambiguity. *See NVT Technologies v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) (identifying a patent ambiguity in 2004, over two years after the award was issued in 2001, despite this court's having concluded that the solicitation had only one reasonable reading); *West Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 30 (2008) (finding a patent ambiguity that the VA did not identify until more than a year after the contract was awarded).

Whether an offeror could submit relevant experience from subsidiaries was the subject of multiple questions answered by the VA in the pre-award process. The offerors asked questions about which companies could be used in the first four REPs. In response to one question, the VA "confirm[ed] … that offerors can use REPs associated with an offeror's divisions, subsidiaries, or affiliates … within the first four REPs." AR1222 (Q&A 756). In response to another question, the VA confirmed that "an offeror could potentially utilize … divisions, subsidiaries, or affiliates to satisfy all 10 of the [solicitation's] REP requirements." AR1219 (Q&A 706). And the VA's interpretation was consistent with this court's reasoning that, in general, "an agency is free to consider the experience of an offeror's parent, subsidiary, or affiliated companies unless there is an express exclusion in the solicitation." *KGJJ Engineering Solutions, LLC v. United States*, 161 Fed. Cl. 556, 565-66 (2022).

King Street points out (ECF No. 594-1 at 29) that the VA stated during the solicitation process that "the mentor's affiliated entities may not be used to satisfy the [mentor-protégé joint venture's] prime REP requirements." AR1220 (Q&A 729). The VA made that statement in response to a question asking whether a mentor's affiliated entities could be used to satisfy the "joint venture's prime REP requirements." AR1220. The VA explained on remand that its answer meant that if a joint venture had REPs reflecting its experience as a joint venture, it could not replace those REPs with REPs from the individual joint venture members (including their subsidiaries). AR404095-96. That interpretation is consistent with the language of the solicitation, which required each joint venture to submit experience from the joint venture itself for the first four REPs, if available, but allowed the joint venture to submit REPs from its individual members if it had no experience as a joint venture. AR1919. Thus, the VA's response to Q&A 729 does not address whether an offeror could submit REPs from its wholly owned subsidiaries. The VA's responses

36

showed offerors how the VA intended to decide whether a member's subsidiary's experience could be used for the first four REPs. *See, e.g.*, AR1220. The VA clarified that it intended to broadly count a subsidiary as the "offeror." AR404096-97.

In sum, the first four REPs rule, as elucidated by the VA in response to questions, was unambiguous as to how the VA intended to treat subsidiaries. The rule was ambiguous in terms of how the VA intended to treat members of a joint venture, but that ambiguity was patent, as it was evident from the inconsistencies between sections L.12.1 and L.12.1.1 of the solicitation. *See Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."). Thus, to the extent that protesters take issue with the VA's broad interpretation, those challenges could have and should have been brought pre-award. *See Blue & Gold*, 492 F.3d at 1313.

Protesters also challenge the VA's *application* of the first four REPs rule. King Street challenges the first four REPs of Clear Vantage, a joint venture (ECF No. 594-1 at 27-28). But Clear Vantage relied on work performed by a subsidiary of the protégé of the joint venture (AR11646), which, as explained above, fits within the VA's reasonable definition of what type of affiliates can provide the first four REPs.

King Street and TISTA argue that the VA should have disqualified Alpha, an SDVOSB joint venture, for submitting its first four REPs based on contracts performed by Alpha's members. ECF No. 594-1 at 32-33 (King Street); ECF No. 581 at 30 (TISTA). King Street and TISTA claim that Alpha had REPs of its own (as a joint venture) that it should have submitted instead of submitting its members' contracts. *Id.* But, as the government points out (ECF No. 644 at 84), the VA

37

made clear in its Q&A responses that it would not independently confirm whether a joint venture offeror had four eligible REPs it should have submitted. AR1191 (Q&A 312); AR 1222 (Q&A 757). The VA noted that it had no way "to validate whether or not the [joint venture] did not include REPs that it could have." AR1222. Thus, the VA reasonably did not investigate whether Alpha had other REPs it should have submitted, and King Street and TISTA were on notice pre-award that the VA would not investigate that. *See Blue & Gold*, 492 F.3d at 1313.[8]

TISTA also challenges the first four REPs that VCH used. TISTA argues that the VA "irrationally allowed VCH to use Ekagra's experience within its first four REPs." ECF No. 581 at 12. The government represents the relationship between VCH and Ekagra in the following diagram.



ECF No. 644 at 88.

In other words, VCH and Ekagra are both joint ventures, and they both claim a common mentor member, Harmonia Holdings Group. *Id.* The government argues that because VCH's mentor member, Harmonia, was also a member of Ekagra, VCH can receive credit for work done by Ekagra. ECF No. 644 at 88-89. Unlike another offeror—Digipathy—who received credit for work done by a joint venture with a common protégé member (AR404093), however, VCH did not

---

[8] TISTA and King Street initially raised challenges concerning Digipathy's REP 3. ECF No. 581 at 12-13 (TISTA); ECF No. 594-1 at 28 (King Street); ECF No. 674 at 19 (King Street). TISTA withdrew that challenge in its reply brief (ECF No. 666 at 3 n.2), and King Street withdrew that challenge in a later notice to the court (ECF No. 748 at 1).

provide a statement confirming that Harmonia performed all duties and responsibilities for the submitted task order. Instead, the VA relied on Harmonia's performing at least some of the tasks under the REP or at least providing mentorship for the tasks. AR404094.

That does not fall within the bounds of the first four REPs rule. The VA was not within its authority to decide that Harmonia's performing some unknown share of the tasks of the joint venture Ekagra was sufficient for VCH to claim Ekagra's experience as having been performed by its member Harmonia. Unlike a small business protégé member (13 C.F.R. § 125.11), the mentor member does not automatically get to take credit for the work of a joint venture. But even though the VA's decision to validate VCH's REP 4 was erroneous, the error was harmless. TISTA does not contend that, but for VCH's receiving points for its REP 4, TISTA would have been an awardee. Thus, TISTA has not established prejudicial error. *See Asset Protection & Security Services, L.P. v. United States*, 5 F.4th 1361, 1365 (Fed Cir. 2021).

Further, as discussed above, the VA was within its authority to on-ramp two offerors, making the awardee pool thirty-two instead of thirty. *See generally* part II.A. If VCH were to lose its award because the VA improperly credited VCH's REP 4, the result would be that the VA would have an award pool of thirty-one (or thirty if there was an error with respect to VetsEZ, *see* part II.B.2), and no other offeror would receive an award. *See generally* part II.B.2; ECF No. 644-1 at 2-3 [¶3]. Therefore no offeror can show prejudice based on the VA's having improperly credited VCH's REP 4. Without prejudice, the VA's award decision cannot be undone.

In sum, the protesters' challenges to the VA's interpretation and evaluation of the first four REPs fail. Because the VA reasonably interpreted the first four REPs rule, and because the offerors were on notice of the VA's interpretation, the court will not address the protesters' arguments concerning the appropriate standard for assessing prejudice based on latent ambiguities.

> **2.    The VA rationally interpreted the requirement for subcontrac-
> tor letters of commitment**

Related to the first four REPs rule, the solicitation required an offeror to provide a subcontractor letter of commitment in some circumstances when the offeror relied on the experience of the subcontractor for a REP. AR1916. Eight protesters challenge the VA's interpretation of the subcontractor-letter-of-commitment requirement. *See* ECF No. 562 at 11-20 (Arrow); ECF No. 566 at 11-19 (Intellect); ECF No. 594-1 at 29-32 (King Street); ECF No. 564 at 11-20 (Omni Cares); ECF No. 589-1 at 30-34 (Pinnacle); ECF No. 560 at 11-20 (T4NG2 JV); ECF No. 581 at 4-13 (TISTA); ECF No. 557 at 11-20 (Vision Tech).

Section L.10.6 of the solicitation requires a subcontractor letter of commitment for "each proposed subcontractor, as well as *any parent company, affiliate, division, or subsidiary identified in the Offeror's proposal* that is being used under a REP." AR1916 (emphasis added). Because the italicized phrase does not explicitly reference a subcontractor, the VA later determined that the solicitation was ambiguous on one issue. According to the VA, the solicitation could reasonably mean that a letter of commitment was required for affiliates of the offeror but not for affiliates of a subcontractor. *See* AR404090. Or it could mean that a letter of commitment was required either way. Offerors asked questions during the solicitation process that underscored that ambiguity. *See, e.g.*, AR992 (Q&A 1: "recognizing that corporate affiliates and subsidiaries are distinct from 'subcontractors'" as described in section L.10.6); AR1213 (Q&A 616: noting that the letter of commitment requirement discussed subcontractors as distinct from "divisions, subsidiaries, or affiliates where common control is demonstrated via a Letter of Commitment"); AR1219 (Q&A 708: asking the VA to confirm that a letter of commitment was necessary only for "(1) a proposed subcontractor's and/or (2) a parent, affiliate, division, or subsidiary's work, as a Relevant Experi-

ence Project"). Those questions demonstrate that some offerors interpreted section L.10.6 as distinguishing subcontractors from an offeror's affiliates, without addressing requirements for a subcontractor's affiliates.

On remand, the VA acknowledged that the solicitation was ambiguous as to whether an offeror was required to provide a subcontractor letter of commitment to show a relationship between a prime offeror and the company that performed a REP submitted by that offeror. AR404090 ("It is a reasonable interpretation … to consider that a [subcontractor letter of commitment] would only be required for (1) a proposed subcontractor, or (2) an entity affiliated with the Offeror … that performed a REP.").

The VA also acknowledged that it had treated some offerors inconsistently with respect to the letters: Some offerors were penalized for failing to provide letters while others in similar situations were not. AR404090. To remedy the situation, the VA took an expansive view, requiring subcontractor letters of commitment in fewer possible situations. Under its more expansive view, the VA did not require a letter of commitment from a subcontractor where the offeror had already provided a letter of commitment from the subcontractor's parent company. *See* AR404090 (discussing the issue in the context of Technatomy's submission). The VA took corrective action, restoring points for the offerors that had been penalized. AR400271.

For example, the VA originally deducted points from Technatomy's self-score because it provided a subcontractor letter of commitment from Maximus Federal Services ("Maximus Parent") but not from Maximus Federal Consulting ("Maximus Subsidiary"), the subsidiary of Maximus Parent that actually performed the tasks in Technatomy's REPs 6 and 7. AR404089. On remand, the VA applied its more expansive interpretation of section L.10.6, under which Technatomy was not required to submit a letter of commitment for Maximus Subsidiary because

41

it had already submitted a letter of commitment from Maximus Parent. AR404090. Because Maximus Parent wholly owns Maximus Subsidiary, the VA determined that it was "reasonably clear that [Maximus Subsidiary] is committed to supporting Technatomy as a subcontractor for T4NG2 task order requirements." AR404091. Thus, the VA restored Technatomy's points for its REPs 6 and 7 that the VA had previously deducted for failure to submit a subcontractor letter of commitment. *Id.*

The government argues that the ambiguity in the solicitation was patent, meaning protesters had to raise concerns pre-award. ECF No. 644 at 102-05. The protesters argue that the ambiguity was latent and required the VA to allow offerors to amend their proposals. *See* ECF No. 562 at 10 (Arrow); ECF No. 566 at 10 (Intellect); ECF No. 564 at 11 (Omni Cares); ECF No. 560 at 11 (T4NG2 JV); ECF No. 557 at 11 (Vision Tech).

The government is correct (ECF No. 644 at 102-105) that the ambiguity in the solicitation was patent. As discussed above, the solicitation required a subcontractor letter of commitment for "each proposed subcontractor, as well as any parent company, affiliate, division, or subsidiary identified in the Offeror's proposal that is being used under a REP." AR1916. That language does not make clear whether the solicitation requires a letter of commitment for "any parent company, affiliate, division, or subsidiary" of a subcontractor, or if the solicitation requires such a letter only for an affiliate of the offeror. *See* AR404090 (VA acknowledging the ambiguity). The ambiguity is apparent from the language of the solicitation. The VA received questions concerning that language, further underscoring that the ambiguity was clear from the language of the solicitation. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1310 (Fed. Cir. 2016) ("The presence of ambiguity is demonstrated by the inquiries received during the solicitation process.").

42

There were multiple possible reasonable interpretations of the solicitation. The VA chose the broader interpretation based on the purpose of the requirement: demonstrating that the "affiliated companies and subcontractors are committed to supporting the prime Offerors for T4NG2 task order requirements." AR400274. The VA determined that a party could demonstrate that relationship with or without a letter, if there was sufficient evidence of a relationship between the prime offeror and the company performing the REP. *See* AR400271-72; AR404091; *see also* AR1219 (Q&A 705: when asked what documents an offeror should submit to show that its proposed subcontractor was the parent of the company that performed a submitted REP, the VA responded, "it is incumbent upon the Offeror to submit the information / documentation necessary to substantiate its position").

For example, some offerors explained how a REP reflected the offeror's work (AR16739 (Credence's REP 5)), or the offeror's proposed subcontractor's work (AR40548-68 (VetsEZ's REP 7); AR40881-900 (VetsEZ's REP 10); AR88237-38 (Peregrine's REP 6)). It was permissible for the VA, on remand, to acknowledge the patent ambiguity in the solicitation and consistently apply the broader, but still reasonable, interpretation for when a subcontractor letter of commitment was required. *See Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 576 (2021) ("When a Solicitation is patently ambiguous, the government remains free to select a reasonable interpretation, as it sees fit, during the evaluation and award segments of the procurement process.").

Regardless, as the government explains (ECF No. 644 at 110-13), any error concerning the VA's evaluation of the subcontractor letters of commitment was harmless. None of the protesters lost points for missing letters, and none of the offerors who submitted letters have shown that they could have received more points had they not been required to submit letters. Instead, as the government points out (*id.* at 112; *see also* ECF No. 659 at 43 (Digipathy making a similar argument);

43

ECF No. 722 at 16 (ManTech making a similar argument)), the protesters imply that they successfully obtained letters of commitment from certain subcontractors but were unable to obtain letters from wholly owned subsidiaries of those same subcontractors, putting them at a disadvantage when they then declined to use those wholly owned subsidiaries for REPs. But the additional paperwork burden of getting a signed letter from the subsidiary, when it had a signed letter from the parent, is unlikely to have prevented an offeror from using a subcontractor it wanted to use. And certainly no protester has presented any evidence that it was unable to obtain a letter of commitment from a wholly owned subsidiary of a subcontractor. The protesters thus cannot establish that they were prejudiced by any alleged error in the VA's evaluation of the subcontractor letter of commitment requirement. *See Bannum*, 404 F.3d at 1351.

### E.    The VA rationally evaluated small business participation commitments

Six protesters challenge the VA's evaluation of offerors' small business participation commitments. *See* ECF No. 584-1 at 3-13 (Innovenue, Systematic, Veteran First); ECF No. 594-1 at 7-15 (King Street); ECF No. 569 at 24-35 (ThunderYard); ECF No. 581 at 13-16 (TISTA). The protesters argue that, when the VA checked commitments that were under 75 percent only for whether they were "implausible on their face" (AR400278), the VA abdicated its responsibility to review those commitments. This court previously determined that the solicitation, in stating that it would perform an acceptability review, "contemplated some amount of meaningful review of the offerors' proposed small business participation commitments." *Technatomy*, 173 Fed. Cl. at 500. The protesters argue that the VA, in checking only that reported small business participation commitments were not "implausible on their face," did not meet the requirements of the solicitation. *See, e.g.*, ECF No. 584-1 at 8-9.

The government responds that the VA's evaluation for "facial implausibility" was consistent with the solicitation and with this court's direction that the VA conduct "some amount of

assessment." ECF No. 644 at 113-14 (quoting *Technatomy*, 173 Fed. Cl. at 500). The government argues that it performed a sufficient assessment for four reasons. First, according to the government, awardees are free to hire subcontractors throughout the life of the contract who contribute to the small business participation rate, but those subcontractors need not be named in an offeror's proposal, making an accurate, up-front assessment impossible. ECF No. 644 at 114. Second, the government notes that the VA previously worked with a contractor under the predecessor T4NG contract who achieved a 73.45 percent small business participation rate, indicating that it is plausible that another offeror might meet or slightly exceed that rate. *Id*. Third, the government argues that the VA did check for plausibility when it compared each offeror's small business subcontracting plan to its small business participation commitment to ensure that the subcontracting plan did not render the commitment implausible on its face. *Id*. at 114-15. And fourth, the VA reviewed other aspects of offerors' proposals and did not find anything rendering the proposed commitments implausible. *Id*. at 115. The VA also noted that it would be "difficult, if not impossible" to apply a more searching review to commitments below 75 percent because offerors did not submit narratives for their commitments below 75 percent and because the original solicitation did not warn offerors that there might be a more searching review. *Id*.

For commitments under 75 percent, some protesters argue that the VA should have evaluated proposals for realism; others do not propose a specific standard. *See* ECF No. 581 at 13-15; ECF No. 569 at 25-26; ECF No. 584-1 at 7-13. The "reasonably realistic" standard appears in the solicitation only as applied to proposed commitments at or above 75 percent. *See* AR1405. Nothing in the solicitation requires the VA to apply a "reasonably realistic" or "realism" standard to proposed commitments under 75 percent. The VA is correct that applying such a standard now would impose a previously unstated criterion. *See NARCORPS Specialties, LLC v. United States*, 177

Fed. Cl. 535, 548 (2025) (determining that agencies may not analyze prices for realism without a statement to that effect in the solicitation); *Ceres Environmental Services, Inc. v. United States*, 97 Fed. Cl. 277, 307 (2011) ("[I]t would have been error for the agency to have rejected low offerors based upon an unstated cost-realism evaluation criterion.").

The "facially implausible" standard, as opposed to a "realism" standard, is also consistent with this court's earlier decision in this case. This court noted that the solicitation "contemplated some amount of meaningful review" but did not prescribe the level of scrutiny required. *Technatomy*, 173 Fed. Cl. at 500. The VA's "facially implausible" evaluation standard satisfies the requirement for "some amount of meaningful review."

ThunderYard and TISTA argue that some awardees' small business participation commitments are facially unrealistic based on the subcontractors named in their proposals. ECF No. 569 at 29-31 (ThunderYard); ECF No. 581 at 16 (TISTA). But the VA cannot directly compare an offeror's small business participation commitment to the subcontractors named in the offeror's proposal because the offeror might later hire other subcontractors not named in its proposal. *See* ECF No. 644 at 119-20. Nothing in the solicitation limits an awardee to using only subcontractors named in its proposal. *See* AR400278. And in fact the VA requested REPs and subcontractor letters of commitment to determine each offeror's past performance and competency for the T4NG2 project, not to bind the offeror to a specific subcontracting plan. Thus, the VA could rationally determine that an offeror's commitment percentage was facially plausible even if that percentage did not align with the subcontractors identified in the offeror's proposal.

The government is also correct that the VA's past experience, when a contractor achieved a 73.45 percent small business participation rate under T4NG, T4NG2's predecessor contract, supports the VA's determination that a commitment close to 75 percent is, in general, plausible. ECF

46

No. 644 at 118. The VA rationally relied on that experience in evaluating small business partici-pation commitments. There is no need for this court to disturb the VA's plausibility threshold, especially where the VA then went on to evaluate the facial plausibility of each commitment below 75 percent. *DynCorp*, 10 F.4th at 1315 (explaining that review of bid protests is "highly deferen-tial" and that the court "must sustain an agency action evincing rational reasoning and considera-tion of relevant factors" (quotation marks omitted)).

As the VA noted, if an awardee fails to meet its commitment during the performance pe-riod, the VA may withdraw the awardee's contract for failure to make good-faith efforts to meet its commitment. ECF No. 521-1 at 53 ("[S]uccessful Offerors who receive contract awards will have to make good faith efforts to meet their [small business participation] commitments and re-main subject to a potential termination for default or off-ramp … if they fail to make good faith effort[s]."). That is what the off-ramp option is for. AR1862. Notably, if an awardee has made a 74 percent small business participation commitment, and it gets more than 26 percent of the way into its performance of the contract without any small business participation, that awardee's com-mitment will already be impossible to meet, and the VA should be prepared to begin to impose consequences on that awardee.

Protesters also argue that the VA should have cross-referenced other areas of each offeror's proposal when evaluating its small business participation commitment. For example, protesters compare each offeror's small business participation commitment with its small business subcon-tracting plan, arguing that a discrepancy in those percentages renders the commitment facially implausible. ECF No. 581 at 16 (TISTA protesting the proposals of Booz Allen and Cognosante); ECF No. 594-1 at 9-11 (King Street protesting the proposals of Booz Allen, Cognosante, Credence, Deloitte, and ECS); ECF No. 569 at 33-34 (ThunderYard protesting the proposals of Cognosante

47

and VetsEZ). The protesters argue that those discrepancies indicate that the awardees either are unable to or do not intend to meet their small business participation commitments. ECF No. 581 at 15-16; ECF No. 569 at 34-35. The government responds that the solicitation does not require matching statistics and that the challenged offerors may comply with both commitments by meeting whichever one is higher. ECF No. 644 at 123.

The government has the better argument. An offeror can comply with both a commitment to provide at least 17.5 percent of total subcontracted dollars to small businesses and at least 49 percent of total subcontracted dollars to small businesses by meeting the higher goal of 49 percent. *Compare* AR13796 (Cognosante's small business subcontracting plan) *with* AR13746 (Cognosante's small business participation commitment).

And in at least some of the proposals that protesters challenge, the subcontracting plan and small business commitment numbers are the same; the percentages differ only due to a difference in the denominator. For example, Deloitte proposed a small business participation commitment of 65 percent (AR19479) and proposed that all (100 percent) of the subcontracted small businesses would fall within four socioeconomic categories (AR19475). Those numbers differ only because Deloitte calculated the 100 percent small business subcontracting plan value based on total sub-contracted dollars, while it calculated the 65 percent small business participation commitment based on total contract value. When both percentages are calculated using total contract value, Deloitte's small business subcontracting plan goals match the commitment percentage of 65 per-cent. Thus, although the solicitation does not require matching statistics, some of the challenged statistics differ only because they are calculated using a different denominator. *See, e.g.*, AR18287 (Credence's subcontracting plan); AR17972 (Credence's commitment); AR26416 (GovCIO's subcontracting plan); AR26425 (GovCIO's commitment); AR29866 (ManTech's subcontracting

plan); AR29860 (ManTech's commitment); AR34553 (SAIC's subcontracting plan); AR34542 (SAIC's commitment).

King Street also argues that each offeror must qualify for points under the veteran-owned small business (VOSB) factor to earn points for related small business participation commitments. ECF No. 594-1 at 13-15. King Street argues that any offeror who did not identify any SDVOSB or VOSB subcontractors in its proposal, and thus did not receive points under the VOSB factor, should not receive points for proposed commitment rates. *Id*. at 14-15.

Offerors could receive points under the VOSB factor for either being a VOSB, being an SDVOSB, or proposing to subcontract with VOSBs or SDVOSBs. AR1904. To receive points for proposing to subcontract with VOSBs or SDVOSBs, an offeror was required to identify the proposed contractors, describe the proposed contracts, and provide each contract's approximate dollar value. *Id*. But, as noted above, an offeror can satisfy its small business participation commitment using unidentified subcontractors that it hires in the future. It is therefore plausible that an awardee could meet its commitment despite not originally naming any small business subcontractors in its proposal and therefore not receiving points under the VOSB factor.

Four protesters also argue that the VA violated Veterans Affairs Acquisition Regulation (VAAR) 852.215-70 by failing to consider that regulation when evaluating small business participation commitments. ECF No. 594-1 at 13-15 (King Street); ECF No. 584-1 at 12-13 (Innovenue, Systematic, Veteran First). VAAR 852.215-70, which was incorporated into the solicitation (AR1904), requires non-veteran offerors seeking credit for using certified SDVOSBs or VOSBs as subcontractors to provide the names of the proposed subcontractors and a "brief description of the proposed subcontracts and the approximate dollar values of the proposed subcontracts." VAAR 852.215-70(c). The protesters argue that the VA unreasonably validated points for awardees who

49

failed to provide descriptions or approximate dollar values associated with their small business participation commitments. ECF No. 594-1 at 14. As the government points out (ECF No. 644 at 127), the VA validated the challenged points under each awardee's small business participation commitment, not the VOSB factor. VAAR 852.215-70(c) applies to the VOSB factor, which concerns subcontractors identified in the original proposal, not the small business participation commitment, which concerns the use of subcontractors throughout the life of the contract. *See* AR1945 (incorporating VAAR 852.215-70 into the SDVOSB and VOSB factors but not into the small business participation commitment aspect of the solicitation). Thus, the VA was not required to evaluate each offeror's small business participation commitment using the criteria set forth in VAAR 852.215-70(c).[9]

The solicitation does not require an offeror to comply with the VOSB factor to receive points for its small business participation commitment. The government's decision to not read in such a requirement during its evaluation process was therefore not arbitrary or capricious.

**F.    The VA rationally analyzed the potential for collusion**

TISTA argues that the VA "arbitrarily and capriciously evaluated potential collusion among offerors and awardees." ECF No. 581 at 18. The solicitation permits a single company to join multiple teams, for example by being a member of multiple joint ventures. AR1910-11. The solicitation notes, however, that "caution shall be taken" to ensure that overlapping ventures do not "establish an arrangement that may lead to collusion." *Id*. The solicitation provides examples

---

[9] TISTA raises concerns that VetsEZ received points for having an SDVOSB on its team that it later dropped and also argues that VetEZ had likely planned, when it thought it qualified as a small business, to self-perform most of its small business participation commitment. ECF No. 581 at 23-25; ECF No. 666 at 15-17. According to TISTA, once VetsEZ was considered a large business, its commitment became facially implausible. As noted above (part II.B.2), any error with respect to the VA's incorrectly awarding points to VetsEZ would be harmless, as its dropping out of the awardee pool would not allow any other offeror to join the awardee pool.

of collusion: (1) an offeror, with the purpose of restricting competition, made an agreement with another offeror regarding a proposal; (2) an offeror disclosed its proposed prices before the due date; or (3) an offeror attempted to prevent another company from submitting a proposal. *Id*.

TISTA essentially argues that any arrangement in which one company participates in multiple joint ventures "may lead to collusion" unless the joint ventures have specific firewalls in place. ECF No. 581 at 21-23. The government responds that any potential future collusion is a "matter of contract administration that lies beyond this Court's bid protest jurisdiction" and that TISTA's arguments are speculative. ECF No. 644 at 128. The government also argues that because the solicitation expressly permits a single company to participate in multiple joint ventures, TISTA waived its argument that such arrangements are "inherently collusive" by not protesting pre-award. *Id*. at 130.

The solicitation states that joint venture arrangements should not "establish an arrangement that may lead to collusion in proposals submitted in response to this solicitation or may lead to the establishment of [a] collusive arrangement at the task order level." AR1911. That language contemplates that the VA will take precautionary measures to avoid potential collusion when evaluating proposals, not solely during contract administration. The government's argument that potential future collusion is only a "matter of contract administration" is therefore unpersuasive.

But the government has demonstrated that the VA considered the evidence and rationally concluded that there was no evidence of collusion or future collusion from any offeror. As TISTA acknowledges (ECF No. 581 at 20), the VA determined that TISTA's allegations "did not result in a concern [that] there was collusion as defined by the" solicitation. AR400016. In an extensive

analysis (AR400015-90; AR400092-157), the VA determined that the evidence—multiple instances of a single company being a member of multiple joint ventures and certain commonalities among proposals—did not support an inference of collusion. AR4000017; AR400022.

The solicitation expressly allowed one company to be a member of multiple joint ventures. AR1911. The VA found "no evidence of collusive arrangements" and "no evidence of an arrangement in which task order level competitions could be compromised due to the operating relationship between each [joint venture] member should they happen to be competing, or considering competing, for the same task order award." AR400017.

Further, although the VA found commonalities among proposals on labor ceiling rates, the VA weighed that evidence and determined that permitted relationships, such as between a mentor and a protégé, could have led multiple offerors to develop their labor ceiling rate proposals in similar ways without engaging in collusion on the rates themselves. AR400020-21.

The VA also sought and received sworn statements from 32 offerors stating that they had not engaged in collusive activity. AR400018; AR400020; *see also* AR9303 (Canopy's joint venture agreement prohibiting venturers that are bidding on a task order through the joint venture from independently bidding on the task order or from discussing the task order with venturers who are not bidding on the task order through the joint venture); AR400139-42 (SAIC's response and sworn statement confirming that it had not engaged in collusion and stating that similarities among proposals were a function of permissible guidance in a mentor-protégé joint venture). The VA was entitled to rely on the offerors' certifications. *See Allied Technology Group, Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011). The VA took the "caution" required by the solicitation (AR1911). TISTA has not shown that the VA's collusion analysis lacked a rational basis. *See Oak*

*Grove*, 116 F.4th at 1380 (faulting this court for "substitut[ing] its own judgment as to what constitutes an adequate investigation"). To the extent that TISTA argues that a single company's being part of multiple joint ventures is inherently collusive, it needed to have protested the terms of the solicitation, which expressly allow that, pre-award. *See Blue & Gold*, 492 F.3d at 1313-14.

### G.    The VA rationally evaluated veteran employee percentages

TISTA also challenges the VA's evaluation of veteran employee percentages. ECF No. 581 at 16-18. Veteran employee percentages are calculated by dividing the number of veteran employees of a company by the total number of employees of the company. TISTA argues that, although the VA checked the number of employees of each offeror—the denominator—against its records in SAM.gov, the VA "irrationally made no effort to check the numerator in each offeror's veterans employment calculation (i.e., number of veteran employees)." *Id.* at 17-18. The government responds that the VA "reviewed the information in the proposals and multiple databases to validate the [veteran employee] percentages, which meets and exceeds the 'low' level of evaluation contemplated by the solicitation." ECF No. 644 at 133.

The VA verified the proposed veteran employee percentages to the extent that relevant data was available. The VA rationally explained that it could not further investigate the numerators—numbers of veteran employees—without using specific employee names and conducting an audit, which would be impermissible under the terms of the solicitation. AR400301-02. The solicitation did not require offerors to identify their veteran employees by name, nor did it authorize an audit at the proposal evaluation stage. The VA therefore determined that requiring that information now or conducting an audit would amount to using unstated evaluation criteria. *Id.*

As this court noted at the motion-to-dismiss stage, the solicitation conveyed that "the level of evaluation that the VA intended to do was clearly low." *Technatomy*, 173 Fed. Cl. at 501. The VA conducted reasonable, non-arbitrary evaluations based on the available information. As the

VA satisfied the low level of evaluation required by the solicitation, the court will not quibble with the details of that investigation. *Oak Grove*, 116 F.4th at 1380. If TISTA thought a more searching review was required than was described in the solicitation, it needed to protest that pre-award. *See Blue & Gold*, 492 F.3d at 1313-14.

**H.   The VA rationally evaluated whether offerors satisfied the joint-venture-agreement requirement**

Two protesters argue that the VA should have disqualified certain awardees for failing to submit fully compliant joint venture agreements. *See* ECF No. 594-1 at 15-23 (King Street); ECF No. 581 at 25-27 (TISTA). The government responds that the VA's decision not to disqualify awardees was rational and that, even if the decision were irrational, there is no prejudice to King Street or TISTA. ECF No. 644 at 136-52.

In general, the solicitation requires a joint venture that includes a small business to provide a copy of its joint venture agreement. AR1911. Section L.10.5(C)(2)(vi) requires the joint venture agreement to include certain information. *Id.*; AR1912. The agreement must "itemize[] all major equipment, facilities, and other resources to be furnished by each party." AR1912. Section L.10.5(C)(2)(vii) requires the joint venture agreement to list "the responsibilities of the parties with regard to … source of labor, and contract performance." AR1911; AR1913. If a contract is "indefinite in nature," subsections (vi) and (vii) require only a "general description" of the anticipated major equipment, facilities, resources, and responsibilities. AR1911-13.

An offeror who is awarded a contract under the T4NG2 solicitation joins the pool of potential contractors eligible for task orders. An awardee does not know the scope of its future work from the outset. Because the solicitation is "indefinite in nature," each offeror could submit a "general description" of anticipated major equipment, facilities, resources, and responsibilities rather than specifying those details at the proposal stage. AR1912-13. When evaluating proposals, the

VA determined whether each offeror provided enough specifics to meet the "general description" requirement.

The government provides rational bases for the VA's evaluation of whether the challenged proposals satisfied the "general description" requirement and other requirements for joint venture agreements. *See* ECF No. 644 at 138-52; ECF No. 717 at 72-76; *see also* ECF No. 659 at 3-11 (Digipathy providing additional rational bases for the VA's evaluation). The VA reasonably reviewed each proposal and exercised its own judgment in determining whether to disqualify it based on the joint venture agreement requirement. The court will not disturb that reasonable assessment. *See DynCorp*, 10 F.4th at 1316; *DynCorp*, 134 Fed. Cl. at 539 ("We do not reweigh the evidence, but grant to the [contracting officer] wide deference unless plaintiff can demonstrate that the decision lacked a reasonable basis."), *aff'd* 757 F. App'x 927 (Fed. Cir. 2018).

King Street also argues that the VA should not have accepted joint venture agreements that did not name the T4NG2 contract or that included unsigned exhibits. ECF No. 594-1 at 19-23. As the government points out (ECF No. 644 at 139), the solicitation does not require joint venture agreements to explicitly name the T4NG2 contract.

Further, even if the solicitation required a joint venture agreement to be specifically designed for the T4NG2 contract, the VA could reasonably determine that a joint venture agreement related to T4NG2 without explicitly naming T4NG2. For example, Clear Vantage's joint venture agreement includes the T4NG2 contract number (36C10B230011) and is dated within six weeks of the solicitation. AR10832-95. Optimal Link's joint venture agreement is effective as of only three weeks after the T4NG2 solicitation. AR30999. A2E's joint venture agreement was amended within weeks of the T4NG2 solicitation date. AR4654-60; AR912. And non-awardee Mission Partners' joint venture agreement refers to T4NG2 on every page. AR43568-83. So, even if the

solicitation required that joint venture agreements demonstrate that they relate to the T4NG2 contract, the VA rationally determined that the challenged joint venture agreements did.[10]

King Street also argues that Clear Vantage's and Optimal Link's joint venture agreements are deficient because certain exhibits lack signatures. ECF No. 594-1 at 20-21. But, as the government notes, the solicitation does not require a signature on every page of the joint venture agreement or on the exhibits. And here, as the government points out (ECF No. 644 at 144), there is no indication that the venturers do not intend to be bound by the exhibits. Thus, King Street has not demonstrated that the joint venture agreements do not comply with the solicitation or that the VA acted irrationally or arbitrarily in accepting the challenged joint venture agreements.

One other point is worth noting. King Street argues that this court has already determined that a compliant and complete joint venture agreement was mandatory. ECF No. 674 at 15 (citing *Technatomy*, 173 Fed. Cl. at 506-07). But this court determined that the VA appropriately required offerors to supply all the information the solicitation required (*Technatomy*, 173 Fed. Cl. at 506-07); it did not determine the level of description required. For example, King Street argues that Taurian did not name a responsible manager, and Tribility was disqualified for the same failure to name a responsible manager. ECF No. 594-1 at 18; ECF No. 674 at 8. But, unlike Tribility, Taurian named a responsible manager—a joint venture manager—throughout its proposal, and the VA rationally deemed that sufficient. More broadly, the VA was reasonable in interpreting "general description" as a broad term, and its determinations of what constituted a sufficient "general description" are entitled to deference. *DynCorp*, 10 F.4th at 1316; *DynCorp*, 134 Fed. Cl. at 539.

---

[10] King Street originally challenged Digipathy's joint venture agreement on the basis that it did not reference the T4NG2 contract. ECF No. 674 at 10. King Street later withdrew that challenge. ECF No. 748 at 1.

## I.    The VA rationally evaluated alleged misrepresentations

ThunderYard and TISTA both argue that the VA should have disqualified VetsEZ for alleged misrepresentations concerning its SDVOSB status. ECF No. 569 at 14-19 (ThunderYard); ECF No. 581 at 27-28 (TISTA). TISTA also argues that the VA should have disqualified Zetta for the same reason. ECF No. 581 at 27-28. To succeed, the protesters must demonstrate that (1) the challenged awardee made a false statement; and (2) the agency relied on the false statement in selecting the awardee's proposal for the contract award. *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006), *aff'd*, 492 F.3d 1308, 1317 (Fed. Cir. 2007). The government argues that the protesters have not met their burden. ECF No. 644 at 153.

VetsEZ originally represented that it was a small business. AR313897; AR314534-37. That representation was based on the averages of its tax returns from 2017 to 2021. AR313897 n.5. The correct period for consideration, based on regulations promulgated by the Small Business Administration, was 2018 to 2022 (13 C.F.R. § 121.104(a)(2)), even though VetsEZ had not yet filed its tax return for 2022 (AR313897 n.5). The five-year average of VetsEZ's gross receipts from 2018 to 2022 was too large for VetsEZ to qualify as a small business. *See* AR314536-37. After the Small Business Administration determined that VetsEZ was not a small business, the VA recalculated VetsEZ's total score. While VetsEZ's total score decreased when it was categorized as a large business, the score remained high enough to rank among the top thirty offerors. AR204035-36; AR404760; AR404087-88; AR404106. Thus, the VA did not rely on VetsEZ's mistaken representation in selecting VetsEZ as an awardee. Instead, and unlike in *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992), the VA understood VetsEZ's size and nevertheless determined that it was eligible for an award.

The protesters argue that the VA failed to consider the implications of the SDVOSB misrepresentations on other aspects of VetsEZ's proposal. ECF No. 666 at 18; ECF No. 670 at 14.

They point to VetsEZ's ability to meet its small business participation commitment. ECF No. 666 at 18; ECF No. 670 at 14. However, as noted above (part II.E), the VA has determined that each awardee may meet its small business participation commitment throughout the course of the contract, and the VA may withdraw an awardee's contract if it does not make a good-faith effort on that commitment. ECF No. 521-1 at 53. Thus, the VA did not arbitrarily and capriciously fail to consider the impact of VetsEZ's reevaluated size status on the rest of its proposal.

Ultimately, the VA acted within its discretion to decide not to disqualify VetsEZ based on its mistaken representation. *See NetCentrics Corp. v. United States*, 145 Fed. Cl. 158, 169-70 (2019). Based on VetsEZ's revised score, the VA determined that VetsEZ remained within the top thirty offerors. That decision was not arbitrary or capricious.[11]

TISTA also argues that Zetta misrepresented its SDVOSB status. ECF No. 581 at 27-28. Zetta is an SDVOSB joint venture formed of protégé member GigaTech, an SDVOSB, and mentor member Sierra 7. AR404088; AR42493. In response to a size protest, the Small Business Administration determined that Sierra 7 is a large business for this procurement. AR204047. TISTA argues that Sierra 7's size determination should have impacted Zetta's SDVOSB status. ECF No. 581 at 27. But the relevant regulations provide that the SDVOSB status of a mentor-protégé joint venture, such as Zetta, depends on the status of the protégé, not the mentor. 13 C.F.R. § 125.9(d)(1). TISTA has not challenged GigaTech's size status. Nor has TISTA exhausted its administrative remedies by making a size protest against Zetta. *See 22nd Century Technologies,*

---

[11] The protesters also argue that the VA gave VetsEZ an opportunity to cure the defect, which amounted to unequal discussions with VetsEZ, so all offerors should have benefited from discussions. ECF No. 569 at 19-21; ECF No. 581 at 23-25. But it was not a discussion; VetsEZ simply lost the points it would have had as a small business. And regardless, as already discussed (part II.B.2), even if VetsEZ had been disqualified, no offeror would have become an awardee as a result. Thus, any error would have been harmless.

*Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023). Thus, TISTA's arguments concerning Zetta's SDVOSB status fail.

### J.    The VA rationally evaluated other awardees

Two protesters challenge the VA's evaluation of other specific awardees, arguing that they received more points than they should have. Clearview challenges the VA's evaluation of SAIC's past performance. ECF No. 570-1 at 21-25. And TISTA challenges the VA's validation of points for 17 REPs from six awardees, arguing that the awardees' experience did not satisfy the solicitation's requirements. ECF No. 581 at 31-36. As the government addresses (ECF No. 644 at 168-180), the VA rationally evaluated those awardees. As already discussed with respect to SAIC (part II.B.2) and further addressed in detail in the government's brief with respect to all those awardees, the protesters are asking the court to second-guess the VA's technical evaluations. The court will not second-guess the VA's technical evaluation of the challenged awardees. *See E.W. Bliss*, 77 F.3d at 449 (A "court will not second guess" the "discretionary determinations of procurement officials," including on "such matters as technical ratings.").

Further, TISTA raises some of its arguments in a single sentence. ECF No. 581 at 31-36. The court need not address arguments in detail when the protester addressed them only in a single sentence. *In re Killian*, 45 F.4th 1373, 1386 (Fed. Cir. 2022) ("We find that Mr. Killian forfeited any argument on appeal based on those fifty-five documents by failing to present anything more than a conclusory, skeletal argument."); *Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) ("Undeveloped or perfunctory arguments, such as those raised in a factual background section or in the footnotes of a party's brief, may be deemed forfeited or waived."). The need to present arguments fully is especially important in a case like this one, in which the parties are raising dozens of issues argued over thousands of pages of briefing.

And neither Clearview nor TISTA has demonstrated that it would have received an award but for the VA's alleged errors in evaluating those awardees. Thus, their protests fail. *See Bannum*, 404 F.3d at 1351.[12]

### K.    The VA rationally evaluated other protesters

In addition to the categories of challenges discussed above, eight protesters challenge the VA's evaluation of their own proposals. *See* ECF No. 570-1 at 32-34 (Clearview); ECF No. 587 at 28-39 (Freedom Tech); ECF No. 573 at 8-17 (GDIT); ECF No. 589-1 at 10-21 (Pinnacle); ECF No. 584-1 at 21-26 (Systematic); ECF No. 560 at 24-31 (T4NG2 JV); ECF No. 595 at 40-43 (Vector); ECF No. 557 at 24-28 (Vision Tech). Except where noted below, the court agrees with the government's arguments (ECF No. 644 at 180-96, 211-45) that the VA's evaluations of the proposals at issue were not irrational, arbitrary, or capricious.[13]

#### 1.    Clearview

Clearview argues that "the VA should have reviewed and evaluated the narrative in Clearview's CPARS" and given Clearview all claimed points without any deduction. ECF No. 570-1 at 32. As the government points out (ECF No. 644 at 180-84), and as already discussed above (part II.B.2), the solicitation permitted offerors to submit a one-page narrative explaining "any rating elements [that] are below satisfactory." AR1934. The VA rationally reviewed Clearview's proposal and determined that Clearview failed to provide a narrative justifying its less-than-satisfactory ratings. AR400171. It was rational for the VA to review Clearview's CPARS narrative and

---

[12] Although King Street originally challenged the VA's evaluation of SiloDynamics' proposal (ECF No. 594-1 at 23-24), King Street has since withdrawn that challenge (ECF No. 748 at 1).

[13] As already noted (*see supra* n.2), Insignia withdrew its protest, so the court has not analyzed the government's arguments with respect to Insignia (ECF No. 644 at 196-211).

determine that Clearview's "attempt to mitigate" the situation, with no indication that the mitigation was successful, did not justify ignoring less-than-satisfactory ratings. *See* AR400239*;* AR400171. For that reason, in addition to those already discussed, the VA reasonably deducted points from Clearview's self-score. *Taahut*, 849 F. App'x at 266 ("We have recognized that evaluation of past performance is a matter within the discretion of the contracting agency and that the 'agency's reasonable interpretation of the facts is entitled to considerable deference.'" (quoting *Glenn Defense*, 720 F.3d at 910)); *Glenn Defense*, 720 F.3d at 911 (Evaluation of past performance "is owed deference as it is among the minutiae of the procurement process, which [the court] will not second guess." (quotation marks omitted)).

### 2. Freedom Tech

As discussed above, the VA rationally interpreted and applied MFA 4.3 when evaluating proposals. *See* part II.C. As the government points out (ECF 644 at 184 (citing AR404761)), the deductions related to MFA 4.3 alone put Freedom Tech in ninety-first place. Thus, any other alleged errors in the VA's evaluation of Freedom Tech are harmless, because absent those errors, Freedom Tech still would not have a substantial chance of receiving an award. *See Asset Protection*, 5 F.4th at 1365. Further, the court agrees with the government's arguments (ECF No. 644 at 184-91; ECF No. 717 at 87-93) that the VA did not engage in disparate treatment or otherwise make irrational determinations in reducing Freedom Tech's score.

Freedom Tech alleges in particular that the VA looked at narrative explanations in CPARS to the benefit of other offerors but unreasonably denied Freedom Tech that benefit. ECF No. 587 at 28-35. The VA deducted 600 points from Freedom Tech's score based on marginal ratings for Freedom Tech's REPs 6 and 10. AR198150. Freedom Tech argues that the VA should have disregarded those marginal ratings because the narratives describe "an overall (composite) rating of satisfactory." ECF No. 587 at 14 (citing AR61974-77). Freedom Tech also argues that the VA

should have asked for clarifications to give it the opportunity to explain the marginal ratings. ECF No. 587 at 32-34. But Freedom Tech had the opportunity to submit a narrative with its proposal explaining the marginal ratings. AR1944. It did not. AR400168. The VA was not obligated to scour the record for information explaining Freedom Tech's marginal ratings when Freedom Tech declined to provide an explanation. *ST Net, Inc v. United States*, 112 Fed. Cl. 99, 110 (2013) ("[A]n agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place."). And the solicitation was clear that a composite rating of satisfactory is insufficient, as an offeror needed each rating to be satisfactory or above or needed an explanation for any less-than-satisfactory rating. AR1944 (defining "positive past performance" as "a satisfactory or greater rating *for all* of the rated elements over the entirety of the record" (emphasis in original)).

Further, as discussed above (part II.B.1), the VA did not engage in disparate treatment between Freedom Tech's narrative and other offerors' narratives. Freedom Tech has not met the high bar required to demonstrate that the VA was irrational in its review of Freedom Tech's past performance. *Taahut*, 849 F. App'x at 266; *Glenn Defense*, 720 F.3d at 911. Thus, Freedom Tech's arguments concerning the VA's evaluation of its proposal fail.

### 3. GDIT

The VA deducted points from GDIT's self-score based on negative ratings for the project GDIT submitted as its REP 10. AR400171-72. GDIT challenges that deduction. ECF No. 573 at 8-17. As the government argues (ECF No. 644 at 191-96; ECF No. 717 at 93-95), the VA rationally evaluated GDIT's negative ratings. As mentioned above, if an offeror wanted to receive points despite marginal ratings, the solicitation requires an explanation for even one less-than-satisfactory rating. *See* AR1944. GDIT did not provide a separate one-page narrative explanation. AR400172. And the VA rationally declined to dig through later CPARS reports to find any later improvements

in GDIT's performance of its REP 10 project. For the reasons explained by the government, GDIT has not demonstrated that the VA's evaluation of its REP 10 was irrational, arbitrary, or capricious. *Taahut*, 849 F. App'x at 266; *Glenn Defense*, 720 F.3d at 911.

### 4. Pinnacle

Pinnacle challenges the VA's evaluation of its REP 4 (ECF No. 589-1 at 10-21) and argues that the VA did not sufficiently document its evaluation of Pinnacle's proposal on remand (*id.* at 35-37). As discussed above, the VA was under no obligation to scour the record for information that Pinnacle failed to properly highlight in its proposal. *See* part II.B.1. Nor was the VA obligated to document its evaluation of Pinnacle's proposal on remand when the substance and outcome of that evaluation did not change. *Id.*

Furthermore, Pinnacle concedes that there were pages missing from one of the files it submitted in connection with its REP 4. ECF No. 589-1 at 24; ECF No. 669 at 9. Pinnacle argues that the VA should have requested the missing pages through clarifications. ECF No. 669 at 9. As discussed in part II.B.1, the VA is generally under no obligation to engage in clarifications. *See Safeguard Base Operations*, 989 F.3d at 1348. And, as the government notes (ECF No. 644 at 8), allowing Pinnacle to later amend its proposal to add pages arguably would have constituted discussions. The solicitation explained that the VA did not intend to conduct discussions. AR1939. The VA's decision not to seek additional documentation from Pinnacle is consistent with that intent. The court agrees with the government's argument (ECF No. 644 at 211-20; ECF No. 717 at 95-99) that the VA rationally evaluated Pinnacle's proposal as provided and reasonably declined to dig through Pinnacle's documents to find information that Pinnacle failed to highlight or substantiate. *See* AR1917 (requiring an offeror to "substantiate all information" through one of two provided verification methods); AR1920.

### 5.    Systematic

Systematic challenges the VA's deduction of points for insufficient experience under sub-functional area 4.2.7, which requires a contractor to "provide services for evaluation, planning, requirements analysis, design, coding and unit testing, system integration testing, implementation, deploying, providing service for distributing, maintaining or updating a mobile application." AR1814. But, as discussed with respect to main functional area 4.3 above (part II.C), this court will generally defer to the VA's technical determinations. The VA reasonably determined that Systematic's submitted documents did not demonstrate the experience described in sub-functional area 4.2.7. AR403774. This court will not substitute its judgment for the VA's. *Benchmade Knife*, 79 Fed. Cl. at 740.

Even if Systematic had demonstrated that the VA was unreasonable in evaluating its experience with respect to sub-functional area 4.2.7, that error was harmless. Based only on deductions made to Systematic's self-reported score regarding MFA 4.3, Systematic has a ranking of ninety-fifth. *See* ECF No. 644 at 220. Thus, like Freedom Tech, Systematic cannot demonstrate that it would have had a substantial chance of qualifying for an award but for the VA's other alleged errors in evaluating Systematic's proposal. *See Asset Protection*, 5 F.4th at 1365.

### 6.    T4NG2 JV

T4NG2 JV argues that the VA arbitrarily and irrationally deducted points from T4NG2 JV's self-score. ECF No. 560 at 24-31. The government responds that the VA rationally deducted points based on deficiencies in T4NG2 JV's substantiating documents and based on the submitted REPs' failure to satisfy technical criteria. ECF No. 644 at 222-34. The government adequately explains the VA's rational bases for deducting points from T4NG2 JV's self-score, particularly where the VA deducted points for network infrastructure administration, for interoperability, and for T4NG2 JV's experience in physical security rather than cybersecurity. *Id.*; ECF No. 717 at

101. The VA's evaluation of whether a REP meets technical criteria is a technical determination that this court will not disturb. *Benchmade Knife*, 79 Fed. Cl. at 740. T4NG2 JV has not demonstrated that the VA acted irrationally, arbitrarily, or capriciously in deducting points from T4NG2 JV's self-score.

### 7.    Vector

As noted above (part II.B.1), the VA did not act irrationally in disqualifying Vector for submitting the incorrect self-scoring worksheet with its proposal. Vector also submitted the declaration of an employee to support its arguments that it should not have been disqualified for filing the incorrect self-scoring worksheet. ECF No. 593-6 (declaration of Danielle Marie Trout). The government argues that the declaration should be disregarded as an improper "extra-record submission[]." ECF No. 644 at 237. The court need not decide whether the declaration is admissible because the declaration does not alter the court's determination that the VA rationally disqualified Vector.

Despite maintaining its disqualification of Vector, the VA also conducted a reevaluation of Vector's proposal on remand. AR403851. Vector challenges the issues raised in that reevaluation. ECF No. 595 at 40-43. It is not necessary to reach Vector's challenges to the reevaluation because the VA rationally disqualified Vector on other grounds. And, as with other protesters discussed above, the deduction Vector would have received related to MFA 4.3 is enough on its own to drop Vector to a rank of sixty-ninth: Vector claimed 15,887.86 points in its self-score (AR192105), and the VA stated that, had it not disqualified Vector, it would have deducted 280 points from Vector's self-score related to MFA 4.3 (AR403851-55); that would have left Vector with a score of 15,607.85, which would put it in sixty-ninth place (AR404761). Thus, Vector cannot show that it would have had a substantial chance of qualifying for an award but for the other issues identified by the VA. *See Asset Protection*, 5 F.4th at 1365.

The government also adequately explains the bases for the VA's evaluation of Vector's self-reported score. ECF No. 644 at 235-42; ECF No. 717 at 101-03. Even if the VA had disqualified Vector in error, the VA's other deductions from Vector's score were rational, not arbitrary, and not capricious.

### 8. Vision Tech

On remand, the VA deducted a total of 160 points from Vision Tech's self-score based on a lack of sufficient supporting evidence. AR404102-03. Vision Tech challenges the four separate deductions that contribute to that 160-point total deduction. ECF No. 557 at 24-28. First, Vision Tech challenges the deduction to its REP 10 based on the solicitation's section L.12.2. Section L.12.2 explains that an offeror will receive points for a certain kind of REP "if the project is a task order against a multiple-award Federal Government contract." AR1922. To verify, offerors were required to submit (1) the Federal Procurement Data System report "for the multiple-award contract that indicates 'Multiple-Award [indefinite delivery vehicle]'" and (2) the report "for the task order that demonstrates the claimed project was a task order against the multiple-award contract." *Id*. Nothing in the report Vision Tech submitted for REP 10 indicated that the task order was under a multiple-award contract. *See* AR112234-36. Vision Tech argues that the task order's multiple-award status was verifiable "in the [Federal Procurement Data System]." ECF No. 557 at 25. The court need not decide whether the Federal Procurement Data System is outside the record, because it was reasonable for the VA to rely on the information in the report Vision Tech provided, which indicated that the task order was not against a multiple-award contract. AR112235-36.

As to Vision Tech's challenges to the other three deductions, the government adequately explains the rational bases for the VA's determination that Vision Tech did not provide sufficient evidence supporting its self-reported scores, particularly on Vision Tech's technical experience. ECF No. 644 at 243-45; ECF No. 717 at 104.

66

**L.    The court need not decide the SAM.gov registration issue**

Intervenor Cognosante argues that three protesters (Intellect, Omni Cares, and Pinnacle) lack standing to protest because their SAM.gov registrations lapsed after they submitted their proposals. ECF No. 657 at 2-4; *see also* ECF No. 717-1 at 25-38 (Intellect SAM registration); ECF No. 717-1 at 40-54 (Omni Cares SAM registration); ECF No. 717-1 at 55-65 (Pinnacle SAM registration). Cognosante also argues that Clearview lacks standing because it did not have an active SAM registration when it submitted its proposal. ECF No. 657 at 4-5; *see also* ECF No. 717-1 at 2-7 (Clearview SAM registration). The government supports both arguments. ECF No. 717 at 110. The solicitation incorporated the 2018 version of FAR § 52.204-7 (AR1901), which requires an offeror to maintain continuous SAM registration from the time of initial offer through award. 48 C.F.R. § 52.04-7(b)(1) (2018). According to Cognosante and the government, if an offeror's SAM registration lapses after the offeror submits its initial offer, the offeror is disqualified, just as an offeror is disqualified if it was not registered in SAM when it submitted the offer. *See* ECF No. 657 at 2-3 (citing *Analysis, Studies, & Training International v. United States*, 175 Fed. Cl. 523, 534-35 (2025)). In the government's view, those deficiencies in SAM registrations may be considered in terms of either standing or prejudice. ECF No. 717 at 111.

The Federal Circuit has recently explained that 28 U.S.C. § 1491(b)(1)'s "interested party" requirement is a question of statutory, not Article III, standing. *CACI, Inc. Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023); *see also B.H. Aircraft Co. v. United States*, 89 F.4th 1360, 1363 (Fed. Cir. 2024) (The typical "standing issue … [for a bid protest] presents a question of statutory standing rather than Article III standing." (quotation marks omitted)); *see generally Associated Energy Group, LLC, v. United States*, 131 F.4th 1312, 1317 (Fed. Cir. 2025) ("The Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III." (cleaned up)). Because the issue of whether the

protesters satisfied the SAM registration requirement is one of statutory standing, it does not implicate the court's subject-matter jurisdiction. *CACI*, 67 F.4th at 1151. Thus, the court is not required to resolve the SAM registration question before addressing the merits of the protest. *Id.* at 1152; *see also Independent Rough Terrain Center, LLC v. United States*, 172 Fed. Cl. 250, 260 n.5 (2024).

As discussed above, the protesters' challenges to the T4NG2 solicitation process fail on the merits. For that reason, and because the court is doubtful particularly about Cognosante's and the government's arguments with respect to Intellect, Omni Cares, and Pinnacle, when those companies were registered in SAM from the time of their proposals until at least after the first round of awards, it is unnecessary for the court to reach the government's and Cognosante's arguments concerning SAM registration.

### M.    The protesters have not demonstrated prejudice

The government argues that even if the VA did err in its evaluation of some or all of the issues on remand, the protesters fail to demonstrate that any error was prejudicial. To succeed, a protester must establish that, but for the alleged error, "it would have had a substantial chance of securing the contract." *CliniComp International v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quotation marks omitted); *see Bannum*, 404 F.3d at 1351. Because the court has determined that the VA's only arbitrary and capricious action—giving VCH credit for the work of a mentor member of another joint venture—could not have prejudiced any protester (part II.D.1), no protester in this case has met that burden.

Further, as the government points out, the protesters challenge numerous point deductions, but most of those deductions were not large enough on their own to keep any protester out of the awardee pool. In the same vein, the challenges protesters make against the awardees generally do not account for enough points to mean that, if successful, those awardees would be knocked out

68

of the awardee pool to allow the protesters to rise in the ranks and enter the awardee pool. *See* ECF No. 644 at 246-47 (listing the protesters' respective scores, total points invalidated, and number of points needed to reach the awardee pool); ECF No. 717 at 105-10. As noted above, in general the VA rationally interpreted and applied the terms of the solicitation, making it implausible that a protester could successfully challenge enough point deductions to put it in the running for an award.

In sum, in addition to failing to demonstrate that the VA's determinations in evaluating proposals were irrational, arbitrary, or capricious, protesters have failed to demonstrate that any alleged errors were prejudicial.

### N. The protesters are not entitled to injunctive relief

To obtain a permanent injunction, a protester must demonstrate that it succeeded on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). Here, protesters have failed on the merits. Thus, no injunction is warranted. *See Obsidian Solutions Group, LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022) ("There can be no injunctive relief without a corresponding prevailing claim." (quotation marks omitted)).

### O. King Street has not shown that the government's declaration must be excluded

King Street filed a motion to exclude the declaration of Jeffrey Neill. ECF No. 675. The Neill declaration is an attachment to the government's principal brief. ECF No. 644-1. In his declaration, Mr. Neill, the Associate Executive Director of the U.S. Department of Veterans Affairs Office of Procurement, Acquisition and Logistics, Technology Acquisition Center, explains that the VA needs to move forward with performance on the T4NG2 project soon. *Id.* at 1-2. Mr. Neill states that "if the Court were to hold that up to 15 contract awards were made in error, [he] will terminate those awards for the convenience of the government consistent with the Court's opinion

and [he] will not make any new awards to replace them for at least one year." *Id.* at 2. He will, however, make new awards if necessary to ensure that the SDVOSB reserve is satisfied. *Id.* at 2-3. He also states that, if the court holds that "up to eight of the protesters did not receive a contract award in error," he will make awards to those protesters by exercising the on-ramp provision. *Id.* at 3. Mr. Neill justifies that approach by explaining that the T4NG2 project is critical to the VA's mission and that the VA must minimize the potential for future delays to the maximum extent possible. *Id.* at 3-7. The government refers to that declaration in its opening brief when discussing prejudice and other injunction factors. ECF No. 644 at 137, 248, 255-56, 258.

King Street argues that the Neill declaration should be excluded because it is a "post hoc rationalization" and "effectively amend[s] the" solicitation. ECF No. 675 at 2-3. According to King Street, the solicitation "clearly and unambiguously stated that [the] VA would make up to 30 awards," and the Neill declaration contravenes the solicitation by suggesting that the VA might reduce or increase the number of awardees. *Id.* at 3-5.

King Street does not dispute that the VA may rely on a declaration for the purposes of injunctive relief. ECF No. 675 at 2; *see Bannum*, 404 F.3d at 1355. King Street acknowledges that the government is using the Neill declaration to support its arguments "against the protesters' prejudice caused by [the] VA's various errors," although it characterizes that reliance as distinct from "focusing on injunctive relief." ECF No. 675 at 2, 4. The government points out that the solicitation described awarding "up to 30 contracts," not exactly thirty contracts, and that the solicitation reserved the right to make additional awards via the on-ramp. ECF No. 676 at 5. This court has already recognized the validity of the on-ramp provision. *Technatomy*, 173 Fed. Cl. at 498; *see also* part II.A. And it is plain from the language of the solicitation that the VA can award more or

fewer than thirty contracts. Thus, the Neill declaration does not "amend" the solicitation, as King Street argues.

The court is also persuaded that the government has used the Neill declaration primarily for the injunction factors. As King Street itself notes (ECF No. 675 at 2, 4), the government discusses the Neill declaration to show a lack of prejudice to the protesters. The lack of prejudice is relevant to the injunction factors. Further, the VA's expected next steps relate to the factor of irreparable harm. By describing those steps in its principal brief and attachment, the government gave protesters a fair opportunity to address those steps as they pertain to prejudice and the injunction factors. Because the Neill declaration is relevant to the injunction factors, and does not amend the solicitation, the court will deny King Street's motion to exclude the declaration.

## III.    Conclusion

For the reasons stated above, this court **grants** the government's motion for judgment on the administrative record (ECF No. 644). The defendant-intervenors' motions for judgment on the administrative record (ECF Nos. 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 656, 657, 658, and 659) are also **granted**. The plaintiffs' motions for judgment on the administrative record (ECF Nos. 557, 560, 562, 564, 566, 569, 570, 573, 581, 584, 587, 589, 592, 594, and 595) are **denied**. King Street's motion to exclude the Neill declaration (ECF No. 675) is **denied**. The clerk of the court shall enter judgment accordingly.

**IT IS SO ORDERED.**

/s/ Molly R. Silfen
MOLLY R. SILFEN
Judge

71